No. 75,081

STATE OF KANSAS, *Appellee*, v. DOIL E. LANE, *Appellant*.

(940 P.2d 422)

Opinion filed May 30, 1997.

*Ernest L. Tousley*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the briefs for appellant.

*Doyle Baker*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant Doil E. Lane appeals his convictions of aggravated kidnapping, K.S.A. 21-3421 (Ensley 1988), first-degree

murder, K.S.A. 1990 Supp. 21-3401(a), and rape, K.S.A. 21-3502 (Ensley 1988). Defendant claims that the trial court erred in (1) failing to suppress his confession and (2) admitting evidence of a prior conviction for first-degree murder to show intent, identity, and knowledge pursuant to K.S.A. 60-455.

On July 30, 1990, N.S., a nine-year-old female, disappeared while on an errand near her home in Wichita, Kansas. Her remains were discovered on February 18, 1991 in a rural area near Belle Plain, Kansas. Defendant became a suspect in N.S.'s death when several individuals informed the police that Lane might have been involved in N.S.'s murder.

Detectives Snyder and Moore of the Wichita police department went to Lane's residence on April 25, 1991. They asked if Lane would come down to the police department's Exploited and Missing Children's Unit (EMC unit) for an interview regarding N.S. Lane drove to the unit with his mother, Murlene Broughton. Lane made comments to the detectives about a man who Lane claimed had falsely informed the police that Lane was involved in N.S.'s murder. Detective Moore advised Lane of his *Miranda* rights. Lane indicated he understood each right and agreed to talk. The officers then explained to Lane that he was not under arrest and could leave at any time. During the interview, Lane agreed to allow the police to search his home and car and signed a consent to search form. Lane provided an alibi that was later determined by police to be false. When Lane indicated he wanted to speak with an attorney, the interview ceased. After the interview, detectives searched Lane's home and found numerous missing person posters with N.S.'s picture, boxes of children's clothing, and hundreds of girls' panties. Lane told the detectives that he was not involved in N.S.'s murder.

While Lane was being interviewed by the police, SRS workers interviewed his mother. Broughton told the SRS workers that she had recently moved to Wichita from Texas and that she was out of her prescription medicine. She stated to the SRS workers that Lane was not involved in the death of N.S. and also volunteered that he was not involved in the death of B.M., an eight-year-old girl who had been abducted, sexually assaulted, and murdered in San Mar-

cos, Texas, in 1980. Subsequent investigation by the police revealed that Lane had lived in San Marcos in 1980 and had been a suspect in B.M.'s death since 1989.

After the April 25, 1991, interview and search of his home, Lane initiated numerous contacts with law enforcement officials either offering alibis or criticizing individuals who had told police Lane was involved in N.S.'s murder. On April 26, 1991, detectives Snyder and Moore stopped at Lane's house to talk to Lane's mother about her medication. Lane initiated a conversation in which he gave the officers the names of two persons who would verify that he had no means of transportation at the time N.S. disappeared. (On cross-examination at defendant's trial, Detective Snyder testified that the officers had a subsequent discussion with an attorney who told them that if Lane initiated contact, the detectives could talk with him without an attorney being present.)

Between April 29 and May 1, Lane made numerous telephone calls to the EMC unit. On April 29, Lane called Detective Moore to ask him whether Moore had spoken to Lane's nieces, who had previously made allegations of molestation against Lane. Lane denied the allegations. The detectives continued to receive messages that Lane had called the unit. During a conversation initiated by Lane on May 1, Detective Snyder reminded Lane that he had asked for an attorney during the first interview. He told Lane that he could not initiate conversation with him, but that Lane could make an appointment at the EMC unit if he wanted. During that conversation, Lane inquired as to the status of a theft report he had filed against Duane Peterson for allegedly taking some of Lane's property.

On May 2, the detectives returned to Lane's house to verify that Broughton had received her medication. Lane came out of the house and asked if the detectives had interviewed the persons whose names Lane had given them. Lane told Detective Snyder he should talk to Lane's neighbors and investigate Donald Wacker. Lane asked the detectives to return the next day. He told the detectives he had some wheels for skates he wanted the detectives to deliver to his nieces. The following day, May 3, Lane gave the detectives a videotape of a local newscast that showed him partic-

ipating in the search for N.S. On May 6, Lane called Detective Snyder at the EMC unit and again denied he had anything to do with N.S.'s death. Lane informed Snyder that whoever had killed N.S. was sick and would probably kill again. Lane spent the rest of May and June in Texas.

On July 9, the detectives visited Lane's home and spoke with his mother. She expressed concern about Lane's state of mind. She showed the detectives Lane's room where they observed girls' panties and a movie screen with two notes taped to it. One note read "black girl" and the other "white girl in a dress getting the piss beat out of her." Subsequently, the police ordered around-the-clock overt surveillance on Lane. Unmarked police cars were parked in front of Lane's house. Lane complained to Detective Snyder that the surveillance team shined flashlights in his windows at night.

Detectives Snyder and Moore visited Lane's mother on July 10. Broughton told police Lane had threatened her, his stepfather, and two officers on the surveillance team. Broughton was then provided bus transportation to San Marcos, Texas. Later on July 10, Lane stopped the detectives and told them he had a cantaloupe at his house to give them. They gave Lane a ride home. On July 11, Lane again telephoned the EMC unit, asked for Detective Snyder, and told Snyder he wanted to drive to Texas. Detective Snyder explained to Lane he couldn't drive to Texas because Lane's driver's license was suspended. Detective Snyder told Lane Snyder was the only person who could help him and told Lane to call him if he wanted to talk.

On July 12, the detectives met with an FBI behavioral scientist, Tom Saulk, to discuss productive interview techniques to use in child murder cases. Saulk indicated the interview room should contain items relating to the crime and folders with the suspect's name so that the suspect would realize he was the focus of the investigation. In addition, Saulk suggested the interviewer should be an older, fatherly person. Saulk also recommended the police give a verbal *Miranda* warning rather than a written one. Finally, Saulk said not to mention the Texas murder, and he also suggested that

the police provide the suspect with a scenario which would allow the suspect to shift the blame for the death of N.S. to others.

On July 13, Lane approached Detective Snyder's police car and again denied involvement in N.S.'s death. He attempted to discredit information that Duane Peterson had given the police implicating Lane in the murder. Detective Snyder told Lane that Peterson had passed a lie detector test. Lane stated he would also be willing to take such a test in the future. On July 15, Lane contacted Snyder and asked him to interview Lane's neighbors, who would tell Snyder that Lane had nothing to do with the murder.

On July 16, Lane informed a surveillance officer that he was ready to take a lie detector test. Lane, who did not possess a valid driver's license, was driven to the police station by an officer. At the station, Lane met with Lieutenant Waltman, FBI agent Napier, and a polygraph examiner. Lane stated he wanted to talk about the N.S. case. The interview began near noon. The interview room had a window. There were two photographs on the wall depicting the scene where the remains of N.S. were found. In addition, the room contained a file cabinet with Lane's name on it, evidence folders with Lane's name on them, clothing representative of that worn by the victim, and a timeline of the crime on the wall. The polygraph machine was not in the room but was in the car of the agent who would perform the polygraph test.

Prior to the interview, Lane was advised of his *Miranda* rights. Lane acknowledged he understood each of the rights. The first part of the interview consisted of Lane discussing things that were on his mind. About 40 minutes after the start of the interview, Lane requested a soda pop. Lieutenant Waltman left the room to get one. Three or four minutes later, Waltman returned and found Agent Napier and Lane standing outside the interview room. Napier told Waltman that Lane wanted to go home. Napier indicated he had told Lane to wait until Waltman returned and that they would get him a ride. Waltman told Lane he was not under arrest and was free to go. He reminded Lane that Lane had requested to talk with police and stated that the police were willing to talk to him, but if Lane did not want to talk any more, Lane was welcome to leave and the police would provide him with transportation.

Lane changed his mind and stated he wanted to continue to talk to Waltman.

During the interview, Lane told the officers he wanted to take them to his house to retrieve the girls' underwear. He stated that his mother used to dress him in little girls' clothes and he would not have to go to prison if the judge could see the underwear. Lane said that "this" would never have happened if he had received the help he needed. Lane repeated that he had a problem of wearing little girls' underwear. Later, Lane admitted some involvement in N.S.'s murder.

At approximately 5:15 p.m., Lane provided incriminating details as to the disappearance and death of N.S. Soon, he began relating specific details of the crime indicating that Donald Wacker was the main perpetrator. After Lane had provided details of the crime, Waltman *Mirandized* Lane again and tape-recorded Lane's subsequent confession. Lane also confessed to the murder of B.M. in Texas and implicated his mother and stepfather in that crime. The interview ended at 7:15 p.m. After the interview, Lane took the detectives to the location where he had left the body of N.S. Lane was arrested and held in custody. Detectives searched Lane's residence again. During the search, Lane, who had accompanied the police, picked a pair of panties out of a box and told officers they were N.S.'s panties.

During the July 16 interview, Lane was advised of his rights three times. There were several breaks taken. Lane used the restroom, drank soda pop, and smoked. The police did not threaten Lane or make any promises to him. Lane never requested an attorney during the July 16 interview.

Lane was reinterviewed on July 17, 1991. The interview was taped. In attendance were officers from the San Marcos, Texas, police department. Lane again confessed to B.M.'s murder and provided significantly more details regarding B.M.'s murder than previously given. The interview devoted to the Texas murder lasted approximately 1 hour.

The detectives had played Lane's July 16 taped statement to Donald Wacker. Detective Snyder then informed Lane that Donald Wacker had made statements to police which contradicted

Lane's statements as to Wacker's involvement. Lane was told that Wacker blamed Lane for N.S.'s murder. Lane was again advised of his *Miranda* rights, agreed to talk, and did not request an attorney. When he was told of the discrepancies between his and Wacker's accounts of the N.S. murder, Lane admitted that he had been the main perpetrator in the death of N.S. and not Wacker. Lane agreed that Wacker's version of the facts was correct. Lane again confessed to both murders.

In February 1993, Lane was extradited to Texas where he was tried, convicted, and sentenced to death for the murder of B.M. Lane was then returned to Kansas, where he was tried and convicted for the murder, rape, and aggravated kidnapping of N.S. Lane has been returned to the custody of Texas.

## I. Confession

*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), established that statements made by a suspect in custody are not admissible as evidence unless the suspect is informed that he or she has the right to remain silent and the right to counsel before the suspect may be interrogated. 384 U.S. at 479. *Miranda* held that when a defendant indicates "in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." 384 U.S. at 473-74. A suspect may, by conduct or specific words, waive a previously invoked right to remain silent.

Prior to trial, Lane filed a motion to suppress his confession. Lane argued to the trial court that the interview on July 16 should have ended when he expressed his right to remain silent by informing the officer that he wanted to go home. After a *Jackson v. Denno* hearing, the trial court denied the motion to suppress, stating:

"Now, returning to the motion to suppress statements given on July 16th and July 17th of 1991, by the defendant. To properly analyze the situation, I believe we have to start with—you both agree with me based upon your argument and the way you presented your evidence—the April 25th, 1991, meeting where at the request of the police, the defendant comes to the police location voluntarily and begins to speak and then says, I want a lawyer. The discussion then stops.

"Now, at that point, April 25th, 1991, there's no question at all, and I'll so find, that the investigation has focused upon this defendant.

"Following that date, the police make themselves available to the defendant, giving him every opportunity, should he desire, to make a statement to them, to make that statement. They do that without coercion. They do that without solicitation and those two facts are uncontested here and I'll find that it was done without solicitation, without coercion.

"That brings us to July 16th for the purpose of the analysis here. On that date, the defendant approaches the police and he wants to speak to them. He wants to take a lie detector test, is the way he voices his desire.

"A number of preparations are made. The police consult all of their expertise. They call in their outside expertise and they have a conference to make decisions on how best to approach an interview with the person upon which they have focused their investigation.

"As a part of that conference, they consult the Washington, DC-based FBI agent, specialist in human behavior, and get from him general characteristics of individuals who commit such crimes and how they might best take advantage of those general characteristics to carry out their investigation.

"They arrive at a plan and carry out the plan to create a situation that is serene, is the word they used, or one where one interviewed might feel at home, not feel intimidated. They take every precaution to ensure that any coercion or any intimidation or anything that might given evidence of it is overcome or done away with. They even have an interview room with a window in it that is larger than most interview rooms, but they also place items such as the tee shirt that's like the one the victim was wearing when she disappeared and a shoe like one of the shoes that the victim was wearing when she disappeared, certain posters, certain indicia of the investigation called a timeline by you all, files and file cabinets bearing defendant's name for his perusal, for his evaluations, to think whatever he wants to think, all done on purpose by the police.

"At that July 16th interview, he is properly advised of those constitutional rights guaranteed under the Fifth and Sixth Amendments to the Constitution of the United States, as explained by *Miranda v. Arizona*. He incriminates himself on that day. That statement is the subject, of course, here.

"Now, on the 17th, he makes further statements to the police. Those statements incriminate him. The police at this time approach defendant, who's in the jail, they bring him back to this same room and they confront him with the statements made concerning the same incidents, statements made by co-defendant, one Donald Wacker. Declarations against interest amounting to confessions of crime are made by the defendant on that day.

"So the issue then becomes, can this affirmative assertion of a right uttered on April 25th of 1991, by the defendant, be recanted, and if so, was the recantation done freely, voluntarily, knowingly by an individual capable of making such a decision and forming such an intent to freely give up a constitutional right?

"I will find that one can, by action, recant an affirmative declaration and in this particular case, under these particular circumstances, this individual has the capacity to do that. The techniques used in the investigation, the techniques used to obtain the statement were proper in law, in my opinion, and do not amount to coercion.

"So what came forth on July 16th and July 17th was, on July 16th—let me back up. What came forth on July 16th was an individual who had voluntarily come to the police and made declarations of his own free will, after having been advised of his rights under the Fifth and Sixth Amendments. Exhibit 11, I believe, sets out the words used by the police.

"The incident, I don't know if we arrived at a specific time, some 40 minutes perhaps into that statement, where the defendant says, I want to go home, was made prior to any incriminating statements concerning the [N.S.] case.

"The same issue arises then, again. Did he voluntarily recant that termination—and that's what it was, a desire to terminate, decide to go home.

"In my opinion, the inquiry made by the Wichita Police Department, Lt. Waltman, at that time was a proper inquiry to figure out exactly what 'I want to go home' means and to assure the defendant that he could go home if he wished and he would be taken home, if that was his desire or he could go home on his own, and I believe we established that some six blocks away would be his home, be hauled there by automobile or he could go there on his own and when he then decided to enter into further conversation with the Witness Waltman and the— or Waltman and the Witness FBI Agent, whose name escapes me, Nigell (*sic* ), I believe, he did so being fully advised of his rights and there was no need at that time to do anything further at that time, other than have a conversation, no affirmative action on his behalf.

"And to me the overall facts show that Mr. Lane is capable of understanding those rights guaranteed him under law when they are presented to him in the way that they were done, the way they were presented on the four separate times of July 16th and 17th.

"Well, there's no contest that they were done on April 25th. It's what effect is the stopping have of the interview by him, but he was properly advised on the 25th, as well.

"The law in this regard is stated by both of you in your brief and then here today. That's the law governing the issue, in my opinion.

"Taken together and applying that law to all of the facts here presented, and specifically the findings of fact that I have made, lead me to the conclusion that the statements made on the 16th and the 17th would be admissible. The truth of those would be for the jury."

When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and intelligently given, and admits the

statement into evidence at the trial, an appellate court accepts that determination if there is substantial competent evidence to support the trial court's determination. *State v. Johnson*, 253 Kan. 75, 84, 853 P.2d 34 (1993). After a trial court has determined the confession was voluntary, an appellate court will not reweigh the evidence. *State v. Perkins*, 248 Kan. 760, 765-66, 811 P.2d 1142 (1991).

On appeal, Lane argues that the July 16 interview should have terminated when he stated to the officer that he wanted to go home. Lane asserts that all statements made after this request were coerced and inadmissible because he had expressed his decision to remain silent. Lane also claims the trial court failed to consider that his IQ was 77 and he was borderline mentally retarded.

When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. An accused who has expressed a desire to remain silent is not subject to further interrogation by law enforcement authorities until counsel has been made available to the accused, unless the accused initiates further communication, exchanges, or conversations with the authorities. *State v. Matson*, 260 Kan. 366, 373, 921 P.2d 790 (1996) (citing *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 [1981]).

The same rules apply where the right to remain silent is exercised. In determining whether events subsequent to the exercise of a constitutional right constitute a waiver of the previously asserted right, the court must first determine whether the accused actually invoked the right and, if so, the court must then determine whether the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Smith, v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984).Waiver of the right must be knowing, voluntary, and intelligent under the totality of the circumstances. See *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1982); *Matson*, 260 Kan. at 374.

An accused may waive *Miranda* rights by his or her own acts and words in initiating conversation with police. See *State v. Strayer*, 242 Kan. 618, 625, 750 P.2d 390 (1988). In *Strayer*, the defendant was arrested and read his *Miranda* rights. Strayer stated he understood his rights and would not discuss the specifics of the case with police. Strayer then began questioning the officers regarding his apprehension, and, during a lengthy conversation, made incriminating statements. The *Strayer* court held that Strayer waived his *Miranda* rights by his "own acts, words, and surrounding circumstances." 242 Kan. at 625. See also *State v. William*, 248 Kan. 389, Syl. ¶ 15, 807 P.2d 1292 (holding that when a defendant initiates contact with the police after an assertion of a Sixth Amendment right to counsel, defendant waives that right and his or her statements are admissible), *cert. denied*, 502 U.S. 837 (1991).

The admissibility of a criminal confession into evidence as an exception to the hearsay rule is set forth in K.S.A. 60-460, which states:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

.  .  .  .

"(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

The Kansas statutory right is based on the Fifth Amendment to the Constitution of the United States which "guarantees the accused the privilege against self-incrimination from statements that are not freely and voluntarily given or are given under the threat of force or compulsion." *State v. Waugh*, 238 Kan. 537, 540, 712 P.2d 1243 (1986).

Under the Fourteenth Amendment due process voluntariness test, a case-by-case evaluation approach is employed to determine whether coercion was impermissibly used in obtaining a confession. Coercion in obtaining a confession from an accused can be mental as well as physical. In determining the voluntariness of a confession of crime, the question in each case is whether the defendant's will was overborne at the time of the confession; if so, the confession cannot be deemed the product of a rational intellect and a free will. *State v. Waugh*, 238 Kan. at 541 (citing *State v. Soverns*, 215 Kan. 775, 777, 529 P.2d 181 [1974]).

In determining whether an accused's confession is voluntary, a court is to look at the totality of the circumstances. The burden of proving that a confession is admissible is on the prosecution, and the required proof is by a preponderance of the evidence. Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether it was the product of the free and independent will of the accused. *State v. Morris*, 255 Kan. 964, Syl. ¶ 1, 880 P.2d 1244 (1994). A statement may be considered voluntary if the accused was not deprived of the free choice to admit, deny, or refuse to answer. *State v. Zimmerman*, 251 Kan. 54, 62, 833 P.2d 925 (1992).

Involuntary confessions offend due process only when they flow from the improper conduct of law enforcement officials. *Colorado v. Connelly*, 479 U.S. 157, 163-67, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986). Here, there was nothing improper in the officers' conduct when Lane stated he wanted to go home during the July 16 interview. In fact, when Lane asked to leave, the police communicated their readiness to provide him with transportation. Agent Napier merely told Lane to wait until Waltman returned and they would see about getting him a ride, and asked Lane why he wanted to go since Lane had initiated the conversation. Waltman told Lane he was not under arrest and was free to go. He reminded Lane that Lane was the one who had requested to talk and the police

were willing to talk to him, but if Lane did not want to talk any more, he was welcome to leave. Then Lane changed his mind and stated he wanted to continue to talk to Waltman. These facts do not indicate that the police coerced Lane into continuing the interview.

As to Lane's claim that his mental condition requires suppression of his confession, we note Lane's IQ was 77 and he was considered borderline mentally retarded. In *Connelly*, 479 U.S. 157, the defendant walked up to a police officer on the street and started confessing to a year-old murder. The police officer *Mirandized* the defendant and asked questions to determine if the defendant had been drinking. The defendant kept confessing. The defendant subsequently revealed that God told him to come to Denver and confess, and it became obvious defendant was mentally ill.

The United States Supreme Court determined that the mental condition of a defendant is a significant factor in determining whether a confession is voluntary, but a defendant's mental condition, by itself and apart from its relation to official coercion, should never dispose of the inquiry into constitutional voluntariness. The Court stated further that the totality of the circumstances is to be used to determine voluntariness of a confession, mental illness is only one factor to be considered in that determination, and there must be a link between coercive activity of the State and the confession. 479 U.S. at 164-65.

Here, we agree with the trial court that there was no coercion. Lane initiated the July 16 interview when he offered to take a polygraph test. The conversation between Lane and the officers after he asked to go home was brief and not threatening. There is no evidence that police tried to trick or coerce Lane into confessing. (At trial, Lane testified that the officers told him that his mother and stepfather were in Texas telling the authorities that Lane was responsible for the murder of B.M. and that he should "beat them to the punch." This evidence was not before the trial court at the *Jackson v. Denno* hearing). Further, Lane initiated communications with the police on numerous occasions, generally to mislead the police with alibis for the crime, all of which turned out to be false. Although Lane might have been of low intellect,

he was sufficiently aware of what was occurring during the April 25 interview with police to request an attorney. We find his mental condition was not a significant factor rendering his confession involuntary.

Although not binding in this case, it is interesting to note that the Texas Court of Criminal Appeals stated in ruling upon the admissibility of Lane's confession obtained in Kansas as to the murder of B.M.:

"The police engaged in no actions that could be remotely characterized as coercive. The interviews were low key and nonconfrontational, appellant was *Mirandized* numerous times, and officers asked appellant several times if he would agree to continue the interviews. . . . Appellant was provided with something to drink upon request and permitted to smoke. No threats or promises were made, there was no violence, and appellant did not suffer from physical illness during the interviews. There is also no evidence that appellant was isolated from his friends and family, and although appellant did not actually consult an attorney, he was reminded numerous times that he was free to do so.

"Moreover, appellant appeared to understand the questions. He individually acknowledged understanding each *Miranda* warning. The officers permitted appellant to initiate the topics for discussion during the early interviews, and later, the police questions were generally non-leading in nature." *Lane v. State*, 933 S.W.2d 504, 512-13 (Tex. Crim. App. 1996).

Here, there is substantial competent evidence to support the trial court's finding that Lane's confession was voluntary.

## II. K.S.A. 60-455 Evidence of Other Crimes

Lane contends the trial court erred in admitting evidence of the prior Texas conviction of the abduction, sexual assault, and murder of B.M. pursuant to K.S.A. 60-455 to prove intent, identity, or knowledge. Prior to trial, the district judge ruled that evidence of the abduction, sexual assault, and murder of B.M. in Texas was admissible pursuant to K.S.A. 60-455 to prove intent, identity, or knowledge in the subsequent Kansas murder of N.S.

The State first argues Lane cannot raise this issue on appeal since he failed to object to the admission of that evidence at trial. When an unfavorable ruling on an evidentiary question prior to trial is received, a party must make a timely objection to such evidence when introduced at trial in order to preserve this issue for appeal.

*State v. Peckham*, 255 Kan. 310, 327, 875 P.2d 257 (1994). At trial, evidence of the Texas murder was introduced through Lane's taped confession and through testimony of Captain Lisa Dvorak, a detective from the San Marcos police department. The record reflects that defense counsel objected to direct examination testimony of Lieutenant Waltman which referred to Waltman's conversation with Lane as to B.M.'s murder and the introduction of Lane's taped confession to the B.M. murder. However, when Captain Dvorak testified as to Lane's arrest and conviction for B.M.'s murder, no objection or continuing objection was made concerning the B.M. murder evidence. Defense counsel states in his reply brief that "the defense did not believe it necessary to object to every additional mention of that same prior crime." However, even if there had been an objection to the testimony, it was admissible pursuant to K.S.A. 60-455, which provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

There are three requirements which must be satisfied for evidence to be admitted under K.S.A. 60-455. The district court must find that (1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice. *State v. Nunn*, 244 Kan. 207, 211, 768 P.2d 268 (1989). If the requirements for admission of evidence of prior crimes pursuant to K.S.A. 60-455 are met, the scope of appellate review is limited to whether the trial court abused its discretion. *State v. Blackmore*, 249 Kan. 668, Syl. ¶ 2, 822 P.2d 49 (1991). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 (1991).

The evidence of B.M.'s murder in Texas was admitted to prove identity of the person that later killed N.S. in Kansas. Where a prior conviction is offered for the purpose of proving identity, the evidence should disclose sufficient facts and circumstances of the offense to raise a reasonable inference that the defendant committed both crimes. *State v. Williams*, 234 Kan. 233, Syl. ¶ 1, 670 P.2d 1348 (1983). Similarity must be shown in order to establish relevancy. *State v. Henson*, 221 Kan. 635, 644, 562 P.2d 51 (1977). It is not sufficient simply to show that the offenses were violations of the same or similar statutes; there should be some evidence of the underlying facts showing the manner in which the other offense was committed so as to raise a reasonable inference that the same person committed both offenses. *State v. Bly*, 215 Kan. 168, 177, 523 P.2d 397 (1974).

First, we note identity was a material fact in the Kansas death because Lane testified that he was not involved in N.S.'s death. At the pretrial hearing, the State proffered evidence that demonstrated similarity in the deaths of B.M. and N.S. Both victims were young and small females: B.M. was eight years old and weighed 45 pounds, and N.S. was nine years old and weighed 50 pounds. Both victims were abducted from a residential area and taken to secluded areas: N.S. to a rural area in the country and B.M. to a deserted shack in a park. In both cases, the victims' panties were missing. In addition, the defendant committed both crimes with assistance from other parties: his mother and stepfather in the B.M. case, and Donald Wacker in the N.S. case. In admitting evidence of N.S.'s murder in Kansas, the Texas court at 933 S.W.2d at 517-18 also noted the similarities in the two murders:

| B.M. CASE | N.S. CASE |
|---|---|
| "VICTIM PROFILE | VICTIM PROFILE |
| — One (1) Victim | — One (1) Victim |
| — Female Victim | — Female Victim |
| — Child Victim | — Child Victim |
| — Same Approx. Age (8 yrs old) | — Same Approx. Age (9 yrs old) |
| — Victim was 'Unknown Stranger' | — Victim was 'Unknown Stranger' |
| KIDNAPPING | KIDNAPPING |
| — Victim was Abducted | — Victim was Abducted |
| — Victim was Abducted/Public Area | — Victim was Abducted/Public Area |

— Victim was Abducted Near Victim's Home

— Victim was Physically Relocated (. . . City Park/Commanche St. Residence)

**DEFENDANT HAD 'NEXUS' TO LOCATION OF ABDUCTION**

— Victim was Resident of Nearby Brown School

**VICTIM WAS PHYSICALLY ASSAULTED**

**VICTIM WAS SEXUALLY ASSAULTED**

**VICTIM WAS MURDERED**

— Defendant 'strangled' victim

**VICTIM'S BODY WAS 'DUMPED'**

**DEFENDANT COMMITTED OFFENSE WITH CO-ACTOR**

— Woody and Murlene Broughton

**DEFENDANT INVOLVED WITH 'SEARCH'**

**DEFENDANT CLAIMED 'TROPHY' FROM CRIME**

— Wore [B.M.]'s Underwear

— Victim was Abducted Near Victim's Home

— Victim was Physically Relocated (. . . Belle Plain, Kansas)

**DEFENDANT HAD 'NEXUS' TO LOCATION OF ABDUCTION**

— Defendant Delivered 'Penny Power' Circulars in this area

**VICTIM WAS PHYSICALLY ASSAULTED**

**VICTIM WAS SEXUALLY ASSAULTED**

**VICTIM WAS MURDERED**

— Defendant 'strangled' victim

**VICTIM'S BODY WAS 'DUMPED'**

**DEFENDANT COMMITTED OFFENSE WITH CO-ACTOR**

— Donny Wacker

**DEFENDANT INVOLVED WITH 'SEARCH'**

**DEFENDANT CLAIMED 'TROPHY' FROM CRIME**

— Took [N.S.]'s Underwear"

There are clearly similarities between the facts surrounding the murders of B.M. and N.S. Based upon these similar facts, the offenses were sufficiently similar to allow the admission of the evidence as to who killed B.M. to determine who killed N.S. See *State v. Hanks*, 236 Kan. 524, Syl. ¶ 6, 694 P.2d 407 (1985) ("K.S.A. 60-455 does not require the prior offense to be identical in nature to the offense for which the defendant is on trial; it is sufficient if the offenses are similar."). See also *State v. Henson*, 221 Kan. at 645 (similarities were that the attacks occurred in apartments, involved young women about the same age whom the defendant either

knew or had dated, involved the use of a knife, and were sexually motivated).

Evidence of the B.M. offense was also admissible on the issue of intent. Although Lane argues that intent was not an issue at trial, at the time of the pretrial hearing, the State expected Lane to rely on a defense of diminished capacity and stated so to the court. The criminal law concept of diminished capacity requires the presence of a mental disease or defect not amounting to legal insanity that a jury may consider in determining whether the defendant has the specific intent required for the crime charged. Evidence of diminished capacity is admissible for the limited purpose of negating specific intent. *State v. Friberg*, 252 Kan. 141, Syl. ¶¶ 1, 2, 843 P.2d 218 (1992). Lane never informed the State he had abandoned the diminished capacity claim.

Finally, Lane contends that the prejudicial effect of the prior crimes evidence far outweighs its probative value. Before prior crimes evidence is admissible under K.S.A. 60-455, the trial court must also find that the probative value of the evidence—for the limited purpose for which it is offered—outweighs its natural prejudicial bias and that its prejudice overbalances its contribution to the rational development of the case. *State v. Searles*, 246 Kan. 567, 579, 793 P.2d 724 (1990).

The court orally instructed the jury prior to Captain Dvorak's testimony that it was not to consider her testimony as evidence supporting an inference that Lane committed the crime charged but only to consider the testimony as proof of identity, intent, or knowledge. The court also included a similar written instruction at the end of the trial. Absent any contrary evidence, it must be assumed that the jury followed this instruction, thus minimizing prejudice to the defendant. *State v. Falke*, 237 Kan. 668, 676, 703 P.2d 1362 (1985).

The trial court did not abuse its discretion in admission of the evidence of the murder of B.M.

Affirmed.

ALLEGRUCCI and SIX, JJ., concur in the result.