No. 83,208

STATE OF KANSAS, *Appellee,* v. ARTHUR J. CAENEN, JR., *Appellant.*

(19 P.3d 142)

Opinion filed March 9, 2001. 

*Janine Cox,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Charles R. Reimer,* assistant district attorney, *Nola Foulston,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Six, J.: Defendant Arthur Caenen, Jr., a paranoid schizophrenic, appeals his conviction for premeditated first-degree murder. K.S.A. 21-3401(a). The instrument of death was a passenger car. The victim, a pedestrian, was struck down from behind.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a conviction resulting in a life sentence receives automatic review by this court).

Caenen claims there was insufficient evidence to support his conviction. He also asserts the district court erred in: (a) denying his motion to suppress the video tapes of his police headquarters interrogation, (b) admitting autopsy photographs into evidence, (c) denying his motion in limine to bar testimony from the victim's mother, (d) denying his *Batson* objection to one of the State's peremptory challenges, (e) permitting the prosecutor to use a poster during opening statements, and (f) denying his motion for a new trial. Caenen also claims that cumulative errors warrant reversal.

Finding no error, we affirm.

## FACTS

On March 22, 1998, Jordan Palmer, a 16-year-old, was on his way to meet his father and brother to see a movie. Palmer's car ran out of gas near Kellogg Drive in Wichita. Palmer left his car near a motel. Carrying a gas can from the trunk, he walked on the grass median east along the Kellogg Drive service road to a Costal-Mart gas station. After filling his gas can, Palmer headed back west

towards his car, on or along the left-side grass median of Kellogg Drive.

About the same time, Caenen was driving west from the gas station on the left or wrong side of the Kellogg Drive service road. As Caenen approached the intersection at Heather Street and Kellogg Drive, his car jumped the curb and hit Palmer from the rear. One eyewitness testified Palmer was on the grass; Officer Evans testified Palmer was in the service roadway, not on the grass median, when struck. Palmer was flung into the air, smashed backward into the car, rolled off the hood, was run over, and was dragged underneath the car for more than 100 feet. Palmer suffered massive injuries to his head and died.

Witnesses saw Caenen's car going west from the direction of the Coastal-Mart on the Kellogg Drive service road prior to the impact with Palmer. The evidence showed that Caenen did not appear to swerve or slow down before hitting Palmer. Witnesses saw no vehicles which Caenen may have tried to avoid by moving into the wrong lane. One witness saw Caenen speeding in the wrong lane heading straight for Palmer and thought Caenen would hit Palmer even before he saw the impact. Another witness described Caenen, as he was skidding down the grass median dragging Palmer underneath his car, as appearing to be trying to steer back out onto the street. After Caenen's car had skidded to a stop on the median with Palmer lying beside it, Caenen got out, calmly stepped over Palmer's body, and stood nearby. One witness, who was attempting to aid Palmer, thought Caenen was possibly an off-duty EMT. Caenen was so calm and standing so close, the witness asked him if he had seen what happened; Caenen said, "Yes, I ran him over." When another witness who had seen Caenen hit Palmer inquired if he knew the kid was there, Caenen replied, "Yes." Caenen was observed as being extremely calm and a little dazed at the scene. He told officers, "I did it, I'm mentally disturbed."

Experts testified that Caenen suffers from paranoid schizophrenia, a chronic mental illness whose main symptoms are delusions and hallucinations. Dr. William Levine, a psychiatrist, at the State's request, was involved in Caenen's second interview. Dr. Levine was called in to determine whether Caenen was mentally ill so the

State could decide whether to file charges. Dr. Levine conducted a follow-up interview after Caenen wrote to him saying he had misrepresented the facts in the first interview and that he wanted to clear up the matter. Dr. Levine also received and reviewed materials from other medical professionals. Dr. Robert Barnett, a clinical psychologist, was hired by the defense to do a psychological evaluation of Caenen. He examined him again 6 months after his initial evaluation. Dr. Barnett also reviewed all of the videotapes of Caenen. Investigative reports, Caenen's medical history, interviews of witnesses, and police reports were available to Dr. Barnett.

On the way to police headquarters, Caenen told the police that "he had caused me pain," but Caenen did not explain who "he" was. Caenen later blamed what happened on a VA hospital in Kansas City and said he should have just jumped off a building instead of doing what he did. Caenen told officers that his brain was messed up because in the past he was given Thorazine at a Kansas City VA hospital.

At police headquarters, Caenen's explanations of what happened were inconsistent. He told police that as he drove to the gas station to get a pop, he saw Palmer and that when he left the station, Palmer was walking ahead of him. At that time, Caenen said, he intentionally ran Palmer over. Caenen also told police that he drove to a fast food restaurant and passed Palmer; he said he passed Palmer again after turning around to return to the gas station to get gas. When Caenen left the gas station the second time, he said, he ran over Palmer.

Also, Caenen initially said he had never met Palmer before, except that he had seen Palmer walking along Kellogg Drive in the course of Caenen's travels shortly before running over him. Then, Caenen changed his statement and said he had a confrontation with Palmer at the gas station, where Palmer spat on him. DNA testing revealed none of Palmer's saliva on Caenen's shirt. Several months after the charges were brought against Caenen, but before trial, he called Detective Otis from jail. Otis recorded the conversation. Caenen told the detective that he hit Palmer accidentally while handling some food and soda in the car. All of the videotapes and

telephone tapes were played for the jury. Caenen concedes his telephone conversation with Otis was admissible.

Caenen presented two defenses to the first-degree premeditated murder charge: (1) the killing was an accident, and (2) due to mental illness, he could not form the requisite intent to kill.

Caenen testified at trial that he thought the Kellogg Drive service road was a one-way road. According to his trial testimony, a car came at Caenen, he swerved, hit his brakes, hit the curb, and hit someone. He waited for the police to come. On cross-examination, Caenen testified that he made up stories to tell Detective Otis. Caenen said he hit Palmer, it was an accident, and he did not intend to kill Palmer.

## DISCUSSION
### Insufficient Evidence

We first consider Caenen's contention that there is insufficient evidence to support his conviction. Our standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the State, we are convinced a rational factfinder could have found Caenen guilty beyond a reasonable doubt. *State v. Mason,* 268 Kan. 37, 39, 986 P.2d 387 (1999). If we answer "yes," as we do here, the evidence is sufficient.

Caenen argues, without authority or citation to the record, that he lacked the mental capacity to plan, scheme, or contrive the killing of Palmer. Thus, he reasons that there was insufficient evidence from which a rational factfinder could conclude that he premeditated the killing.

Dr. Levine concluded that Caenen was and is mentally ill. (Caenen's condition is chronic, never goes away, and will never be cured.) Dr. Levine testified that he thought Caenen understood what was going on and agreed that Caenen was oriented to time and place. Dr. Levine said, "[T]here's nothing about paranoid schizophrenia that interferes with a person planning and carrying out an action or deprives a person of the ability to do that." When asked if anything in his interviews with Caenen indicated that Caenen could not think something out beforehand and act upon it, Dr. Levine said nothing indicated that.

Dr. Barnett agreed that Caenen is mentally ill. When asked his opinion regarding whether Caenen may have had hallucinations or delusions during or around the time of the collision, Dr. Barnett said it was possible. He agreed that those with paranoid schizophrenia can have intentional thoughts and can carry out actions based on their thoughts. He agreed that such individuals can think things out beforehand and then act upon those thoughts. Dr. Barnett also agreed that Caenen could do all of those things.

We have listed the following as some of the circumstances which may give rise to an inference of premeditation: "(1) the nature of the weapon used, (2) a lack of provocation, (3) the defendant's conduct before and after the killing, (4) threats and/or declarations made by the defendant before and after the killing, and (5) lethal blows inflicted after the deceased was felled and rendered helpless." *State v. Jamison*, 269 Kan. 564, 572, 7 P.3d 1204 (2000).

The record shows that at least once, Caenen saw Palmer walking on Caenen's drive to the gas station to buy a soda. Caenen's story to officials changed several times, with Caenen telling officers he had passed Palmer as many as three times. Although Caenen admitted to being delusional in the past, he said that he did not know Palmer before and denied that Palmer was a part of any delusions. Witnesses saw Caenen driving down the wrong side of the service road where Palmer was walking. A witness said Caenen swerved the car to the left and it appeared that the car was headed toward the pedestrian.

The evidence showed that Caenen's car was traveling around 41 or 42 m.p.h. when he struck Palmer. The location of Palmer's personal effects, such as glasses, indicated that he was struck before the car's skid marks began. After the car skidded to a stop, Caenen got out of his car and silently stepped over Palmer. One witness asked Caenen if he knew what happened, and Caenen calmly said he had hit Palmer. Caenen told officers that a mind-altered thought came to him before he hit Palmer. He said he ran Palmer down intentionally. Dr. Levine, a psychiatrist, explained that while Caenen suffered from paranoid schizophrenia, his illness did not interfere with his ability, like any normal person, to intend to perform acts, to plan on actions ahead of time, and to act on his thoughts.

The defense psychologist, Dr. Barnett, conceded Dr. Levine's conclusion. Dr. Barnett conceded that Caenen's different stories could be attempts to lessen his responsibility for running Palmer down. The evidence, considered in the light most favorable to the State, shows that a rational factfinder could have found that: (1) Caenen had the mental capacity to plan actions ahead of time and to act on his thoughts, and (2) the act of killing Palmer was one which Caenen thought over beforehand and then carried out.

## Prosecutor's Closing Argument

Caenen also argues that the prosecutor's closing argument misled the jury to believe that intent and premeditation are one and the same. We disagree. The jury was instructed in accordance with Pattern Instructions for Kansas (PIK) Crim. 3d 56.04(b), that states: "Premeditation means to have thought over the matter beforehand." The jury was also instructed that "[t]here is no specific time element required to establish premeditation." We approved this language in *Jamison*, 269 Kan. at 564. In *Jamison*, we pointed out that in *State v. Moncla*, 262 Kan. 58, 72, 936 P.2d 727 (1997), we held that the district court's statement that "premeditation means to have thought over the matter beforehand, and there is no particular time element required to establish premeditation" was a correct statement of law. *Jamison*, 269 Kan. at 572. However, in *Moncla*, we also rejected the use of the phrase "it may arise in an instant" in an instruction on premeditation. We said the addition of such a phrase tended to diminish the clear definition of premeditation under Kansas law. 262 Kan. at 72.

Caenen questions PIK Crim. 56.04(b) by focusing on the prosecutor's closing argument. Caenen objected neither to the instruction nor to the alleged objectionable closing argument.

## Caenen's Motion to Suppress

Next, Caenen contends that the district court erred by denying his motion to suppress his three videotaped interviews. Caenen argues that the videos should have been suppressed because (1) his mental illness prevented him from making a voluntary, knowing, and intelligent waiver of his *Miranda* rights, and (2) he had

asserted his Fifth Amendment right to counsel under the United States Constitution. Caenen's contentions are not persuasive. Our standard of review inquires whether the district court's ruling was supported by substantial competent evidence. *State v. Minor*, 268 Kan. 292, 297, 997 P.2d 648 (2000).

At the suppression hearing, the district court heard the testimony of Detective Otis. In determining whether the accused's confession is voluntary, we look to the totality of the circumstances. *State v. McCorkendale*, 267 Kan. 263, 270, 979 P.2d 1239 (1999). See also *State v. Lane*, 262 Kan. 373, 383, 386, 940 P.2d 422 (1997) (applying the totality-of-circumstances analysis where a defendant's IQ was 77).

First, Caenen contends that Kansas has erroneously carved out an exception in cases where it is alleged that a defendant's mental condition at the time of the confession rendered the confession involuntary. He relies on language in *State v. Pursley*, 238 Kan. 253, 258-59, 710 P.2d 1231 (1985), and *State v. Boan*, 235 Kan. 800, 804, 686 P.2d 160 (1984), superceded by statute as stated in *State v. Hedges*, 269 Kan. 895, 902, 8 P.3d 1259 (2000) (citing statutes applying the new "mens rea" approach to crimes committed on or after January 1, 1996).

In *Boan*, we said:

"In *State v. Pyle*, 216 Kan. 423, 440, 532 P.2d 1309 (1975), it was held that the test for determining whether a suspect has the mental capacity to make a voluntary confession is the same as the test for determining his criminal responsibility for committing the crime. In absence of insanity meeting the *M'Naghten* test, the mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact. A trial court's finding, after a *Jackson v. Denno* hearing, that the defendant was sane and made his confessions knowingly and voluntarily is binding on appellate review if supported by substantial competent evidence." 235 Kan. at 804.

Caenen argues that the *Boan* reasoning violates due process because it fails to distinguish between "issues of incompetency" and insanity. He contends that the *Boan* test places the burden of proof on the defendant to prove that his confession was involuntary. Caenen fails to note that the *M'Naghten* test is no longer applicable to

crimes committed on or after January 1, 1996. *Hedges*, 269 Kan. at 902-03. We addressed and rejected his argument in *State v. William*, 248 Kan. 389, 406-09, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991). (William had a life-long history of mental illness. He was convicted of first-degree murder.)

As the State notes, we have endorsed the totality-of-circumstances analysis in other cases involving mental health and the question of voluntariness. See, *e.g., State v. Mack*, 255 Kan. 21, 32, 871 P.2d 1265 (1994); *State v. Snodgrass*, 252 Kan. 253, 259-62, 843 P.2d 720 (1992).

The district court placed the burden of proof on the State and considered all of the evidence in determining the voluntariness of Caenen's statements.

Caenen also reasons that under the totality of the circumstances, his incriminating statements were involuntary. He properly observes that the Fifth Amendment privilege against self-incrimination is applicable to the States through the Fourteenth Amendment. See *Colorado v. Connelly*, 479 U.S. 157, 162-63, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986). Factors to consider in determining whether a confession is voluntary are: "(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect and background; and (5) the fairness of the officers in conducting the investigation." *McCorkendale*, 267 Kan. at 270.

Specifically, Caenen contends that the fact that he was diagnosed with a mental illness, paranoid schizophrenia, clearly shows that his statements were not a product of his free and independent will. However, he acknowledges that a mental disability does not, of itself, render a confession involuntary.

Caenen observes that during interrogation, he consistently told officers that he was "mind-altered." He argues that his mental illness caused an increased susceptibility to his interrogators' purportedly subtle, but coercive methods. He correctly asserts that coercion can be mental as well as physical. See *Blackburn v. Alabama*, 361 U.S. 199, 207-08, 210-11, 4 L. Ed. 2d 242, 80 S. Ct. 274 (1960) (finding that Blackburn was probably insane at the time

of his confession, and evidence supported a finding that his confession was involuntary. Police tactics included "eight-to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; [and] the composition of the confession by the Deputy Sheriff rather than by Blackburn.")

Caenen points to no instances of coercion on the part of police officers. Although Detective Otis testified at the suppression hearing that Caenen talked to him several times about being "mind-altered," Caenen's speech was clear. The detective said that several times, Caenen would begin to answer a question and then move into another story about his past or about his "mind-alteredness." However, when Otis would direct him back to their current discussion, Caenen was able to follow.

The first interview lasted 1 hour and 45 minutes, with two breaks of 5 or 10 minutes each. Caenen was interviewed by Otis and a second detective. Otis read Caenen his *Miranda* rights, and Caenen initialed each line of the *Miranda* form. Caenen said that he understood his rights. He told Otis that he had obtained a GED, served in the United States Navy, and received an honorable discharge. He also told the detective that he had several previous contacts with police. Otis said Caenen seemed a little edgy, moving around a little in his chair and tapping his fingers on the table. Otherwise, Caenen "appeared to be fine."

Otis testified that because Caenen made several references to having mental problems, it was decided that Otis would sit with Dr. Levine in a second interview the following day. Otis again read Caenen his *Miranda* rights. Caenen indicated that he remembered and understood his rights. He said he would talk. The interview conducted by Dr. Levine lasted just under 2 hours.

During Dr. Levine's interview, Caenen had said that the detective might want to talk to him again. After Dr. Levine finished his interview, Caenen took a 10-to 15-minute break. Then, Detectives Otis and Ralph returned to the interview room to speak with Caenen again. This interview lasted about 1 hour and 15 minutes. Caenen had added some details to his story when talking to Dr. Levine,

so Otis wanted to clarify the details. Caenen's demeanor remained the same.

Caenen has shown neither coercive behavior nor unfairness on the part of the police. He points only to his mental illness as the deciding factor. Mental disability alone is not determinative of voluntariness. See *Lane*, 262 Kan. at 386. Substantial competent evidence supports the district court's finding that Caenen's statements were intelligent and voluntary.

Caenen also argues that because of his mental illness, it cannot be concluded that he voluntarily, knowingly, or intelligently waived his *Miranda* rights. We disagree. Again, mental disability alone will not render such a waiver invalid. See *Lane*, 262 Kan. at 386.

### Right to Counsel

Next, Caenen contends that he invoked his Fifth Amendment right to counsel before he was read his *Miranda* rights. This contention lacks merit.

At the beginning of the first interview, Caenen said, "I wonder if I should talk to an attorney." Then, Caenen simply said he looked at "the guy," meaning Palmer and felt terrible. Detective Otis stopped Caenen and said that they needed to first go over his rights, and then he could decide what he wanted to do. After acknowledging his *Miranda* rights, Caenen agreed to talk to the detective. After a few minutes, Caenen told Otis that he would briefly tell the detective what happened before Caenen would talk to his attorney. Caenen quickly added that he was "mind-altered" and "had a thought" and "hit him," referring to Palmer. Otis clarified what Caenen said about an attorney. He asked Caenen if he wanted to talk to him then without an attorney. Caenen said, "Yes." The detective then asked if it was okay to ask him questions then without an attorney. Caenen said, "Yes."

Caenen acknowledges that his "request" was not unequivocal. However, he argues that officers violated his constitutional rights by failing to clarify his request. He correctly asserts that during an interrogation, if a suspect indicates a wish to speak to an attorney "interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has

consulted with his attorney." *Minnick v. Mississippi*, 498 U.S. 146, 153, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990). See *State v. Williams*, 268 Kan. 1, 13, 988 P.2d 722 (1999).

Caenen relies on *U. S. v. March*, 999 F.2d 456 (10th Cir. 1993) to support his contention that Otis was required to seek further information from him regarding his statement, "I wonder if I should talk to an attorney."

The *March* court concluded: "We believe that whenever a suspect makes a statement or asks a question that appears to contemplate invocation of his right to counsel, as opposed to seeking a better understanding of what his rights are, that constitutes an equivocal invocation of the right to counsel." 999 F.2d at 461. When a suspect requests counsel, the officers must stop all substantive questioning and limit further inquiries to clarifying the suspect's ambiguous statements. The *March* court found that the agents made the clarification required, given the suspect's ambiguous request for counsel. 999 F.2d at 461-62.

In *State v. Morris*, 255 Kan. 964, Syl. ¶ 4, 880 P.2d 1244 (1994), filed a year after *March*, we adopted the ruling in *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), and said:

"When a suspect makes a statement which may be ambiguous as to whether the suspect is asserting a right to remain silent or to confer with counsel, the interrogator may ask questions to clarify whether the suspect is asserting a right to remain silent or to confer with counsel. Although it is good police practice for officers to clarify whether a suspect making an ambiguous statement really wants an attorney, *they are not required to ask clarifying questions.*" (Emphasis added.)

See also *State v. Ninci*, 262 Kan. 21, 43-44, 936 P.2d 1364 (1997) (finding that police were not required to clarify the suspect's ambiguous request for counsel).

Here, the district court said:

"After hearing all the evidence it's the Court's opinion that the defendant did not make an unequivocal request of his rights. I believe that when he did mention an attorney, that the officer acted properly trying to ascertain from the defendant whether or not he still desired to speak with him. The defendant did indicate that he did. Every time thereafter when an attorney was mentioned, the officer once again made an effort to determine whether or not the defendant still wanted to speak to him. The defendant indicated he did. I think the defendant made an

intelligent, voluntary waiver of his constitutional rights and he voluntarily made the statements to the officers."

We agree with the district court. Although under Kansas law clarifying questions are not required where the request is ambiguous, it is clear that Otis did attempt to clarify Caenen's statements regarding an attorney. Caenen agreed to continue with the questioning without having an attorney present. Caenen's video interviews were properly admitted at trial.

### The Autopsy Photographs as Exhibits

Caenen contends that the district court abused its discretion by admitting autopsy photographs, specifically Exhibits 24 and 25. He asserts that because the cause of death was not in dispute and because of the nature of the photographs, Exhibits 24 and 25 were more prejudicial than probative. We disagree.

Our standard of review is abuse of discretion. *State v. Coyote*, 268 Kan. 726, Syl. ¶ 7, 1 P.3d 836 (2000). We have said that even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged. See *State v. Smallwood*, 264 Kan. 69, 84, 955 P.2d 1209 (1998).

Here, pathologist Dr. Deborah Johnson agreed that Exhibit 25 was gruesome. (Exhibit 25 showed the top of Palmer's head, with the scalp removed from view.) The pathologist testified that Exhibit 25 gave an idea of the amount of force that the victim's head endured. It also showed that he suffered damage to both the brain and skull. In *State v. Barksdale*, 266 Kan. 498, 511, 973 P.2d 165 (1999), we found a similar style of autopsy photograph admissible.

Two Exhibits, 23 and 24, showed external and internal damage to the back of Palmer's legs. Caenen argues that Exhibit 24, showing internal leg damage, was "particularly inflammatory because the cause of death had nothing to do with the legs." The two photographs of the legs were used in conjunction with one another to show the location of the vehicle strike points on the back of Palmer's legs. The height of the strike points was significant in deciding whether Caenen applied brakes while hitting the victim. The photographs are relevant to show Palmer's injuries. None of the photographs are repetitious or contain gruesome characteristics

like those we disapproved of in *State v. Boyd,* 216 Kan. 373, 377-78, 532 P.2d 1064 (1975). We find no abuse of discretion in admitting the autopsy photographs.

## The Motion in Limine

We next take up Caenen's contention that the district court erred by denying his motion to exclude the testimony of Palmer's mother. Our standard of review is abuse of discretion. See *State v. Humphery,* 267 Kan. 45, 55, 978 P.2d 264 (1999).

Caenen reasons that it would be irrelevant and prejudicial to place before the jury the story that Palmer called his mother shortly before the collision. Defense counsel argued that the story would be too emotional. Caenen was willing to stipulate to the content of the conversation, regarding when the conversation took place, where Palmer would have been, and why he was walking with his gas can.

The State countered by saying Mrs. Palmer would simply testify about the facts of the conversation, not about her son or their relationship. She would also identify Palmer's clothing and personal effects. At trial, Mrs. Palmer briefly testified, over defense counsel's objection, about her conversation with her son. She identified the clothing that he wore on the day of the collision and identified his cap, glasses, and gas can.

Mrs. Palmer's testimony in no way rises to the personal level of the testimony in *State v. Donesay,* 265 Kan. 60, 82-84, 959 P.2d 862 (1998), cited by Caenen. Moreover, her testimony was relevant. The testimony was neither unduly prejudicial nor emotional. The district court did not abuse its discretion in denying Caenen's motion in limine.

## The *Batson* Issue

Caenen contends that the State impermissibly used one of its peremptory challenges to keep an African-American, R.B., off his jury. Caenen objected to the State's peremptory strike under *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The State responded, giving its reasons for striking the ju-

ror. The district court accepted the State's reasons as racially neutral.

The State offered three reasons for striking R.B.: (1) he was "particularly non-responsive to things," such as conversations with other jurors; (2) he was a single man with "limited, little, or no contact" with children; and (3) he indicated that he never made a large decision in his life. Defense counsel made no attempt to counter these assertions.

Caenen fails to identify the ultimate racial makeup of the jury. We acknowledge that the rule of *Batson* has been extended to include a challenge by a white defendant to the prosecutor's use of peremptory strikes to exclude African-American jurors on the basis of race. *Powers v. Ohio,* 499 U.S. 400, 402, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991). Both Palmer, the victim, and Caenen, the defendant, are white.

Caenen's *Batson* argument fails. The district court did not abuse its discretion in finding that the State's reasons were racially neutral.

### Prosecutorial Misconduct—Opening Statement

Caenen contends that the district court erred by allowing the State to use a poster displaying three of Caenen's statements during counsel's opening remarks to the jury. Caenen objected to the use of the poster, arguing that its use was prejudicial to his right to a fair trial and that it was demonstrative evidence. The district judge overruled the objection saying,

"Well, from having heard pretrial motions, I believe these are matters which come from the statement of the defendant to the police officers. The State, during the course of opening statement, has the right to tell the jury what it hopes and intends to prove. I don't believe this would be improper demonstrative evidence at this time."

Apparently, the poster included the following three statements: (1) "I hit the guy intentionally"; (2) "I went into the left lane and hit the guy"; and (3) "I know what I was doing when I did it." The poster was not included in the record on appeal, so it is impossible to examine it.

Caenen acknowledges the admission of his statements was addressed in pretrial motions. The district court denied Caenen's motion to suppress his statements. Moreover, the videotaped interviews were admitted into evidence at trial, and officers and doctors testified regarding his statements. Caenen acknowledges that the poster might not even be considered "demonstrative evidence." The record shows that the question of admissibility of the statements was resolved before trial.

The prosecutor used the poster to tell the jury what he believed the evidence would show Caenen said. See *State v. McCorkendale*, 267 Kan. 263, 277, 979 P.2d 1239 (1999). The district court did not abuse its discretion in giving the prosecutor latitude in its opening statement. See *State v. Campbell*, 210 Kan. 265, 278, 500 P.2d 21 (1972).

### The Motion for a New Trial

Caenen contends that he was entitled to a new trial because Officer Johnson failed to appear as a defense witness. In resolving this issue, we again inquire whether the district court abused its discretion. See *State v. Mullins*, 267 Kan. 84, Syl. ¶1, 977 P.2d 931 (1999). The answer is no.

Officer Johnson did not respond to a subpoena. Caenen conceded that this issue was not raised at trial. During trial, only one comment was made concerning Officer Johnson. The district court asked: "Does the defense have another witness ready and available at this time?" Defense counsel said, "I will check in the library, Your Honor. Your Honor, Mindy Johnson does not appear at this time." Defense counsel did not request a continuance or give the court any opportunity to act on the missing witness.

The district court correctly found that the officer's testimony would not have altered the outcome of the trial. At the hearing on the motion for new trial, defense counsel said that Officer Johnson was on pregnancy leave at the time of trial. Counsel conceded that Officer Johnson would merely have testified that based on her initial observations at the scene, she concluded that the impact was an accident. Officer Johnson took measurements at the scene, but she did not investigate further.

The record shows that photographs of the skid marks at the scene were admitted into evidence. Officer Johnson prepared a diagram of the scene, which was admitted without objection. Officer Evans testified for the State. She investigated the scene on the day of the collision. She testified that she reviewed the diagram prepared by Officer Johnson. Officer Evans also testified to the length of the skid marks and other measurements taken by Officer Johnson. In addition, Detective Otis testified that he went back to the scene and remeasured using the investigators' measurements. The district court did not abuse its discretion by denying Caenen's motion for a new trial.

Caenen's final contention that cumulative errors require reversal of his conviction is not persuasive.

Affirmed.