(62 P.3d 661)
No. 87,600

STATE OF KANSAS, *Appellee*, v. JAMES P. BLAIR, *Appellant*.

Opinion filed October 4, 2002.

*Rick Kittel*, assistant appellate defender, and *Steven R. Zinn*, deputy appellate defender, for appellant.

*Russ Roe*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Carla J. Stovall*, attorney general, for appellee.

Before GERNON, P.J., GREEN, J., and ROGG, S.J.

ROGG, J.: James P. Blair appeals his conviction of possession of ephedrine.

Blair raises two issues on appeal. He claims that evidence obtained in a search of his home should have been suppressed. He also claims that his sentence is illegal. We agree; we reverse his conviction and vacate the sentence.

Salina police officers went to Blair's residence at 201 East Minneapolis to investigate a Crimestoppers' call about the strong odor of ether emanating from the residence. Officer Cox and Officer Rupert both drove to the residence and parked their cars 75 to 100 feet from it. As soon as Cox got out of his car, he could smell the odor of ether in the air. As the officers were walking to the residence, Cox noticed a gray cloud coming out of the garage from under the overhead garage door that was propped open with a small television set. The door was open about 1 to 1 ½ feet from

the ground. Cox knocked on the garage door but received no answer. Cox did not look under the garage door or try to open the door. Rupert stayed there, and Cox went to the front door of the residence. Blair came to the front door, looked through the window blinds, and asked Cox what he wanted. Cox asked Blair to open the door and told him the officers had received a complaint about the odor from the garage. Cox also told Blair the officers needed to look in the garage to investigate the odor complaint, and Blair said he would rather they not do that. Blair told Cox he was doing some refrigerator work in the garage. Based on his training, Cox suspected there probably was a methamphetamine lab in the garage. Cox asked Blair whether he used any illegal narcotics and whether he had anything illegal in the residence, and Blair answered in the negative. Cox explained again there had been a complaint about the strong smell of ether coming from the garage and the officers had come to investigate it. Cox then asked Blair to pull up his sleeves, and he complied. Cox was looking for any type of needle marks in Blair's arms but did not find any. Cox explained to Blair that due to the health and safety reasons, the officers had to enter the garage. Lieutenant Trocheck, who had just arrived at the scene, told Blair the officers needed to check the garage because of the fumes coming out of it and they might have to call the fire department.

During the conversation with Cox, Blair inquired at least twice whether "he could call an attorney." However, Cox denied his requests. Cox would not allow Blair to go inside the house alone to open the garage door and repeatedly told Blair to have a seat on the porch. Blair testified he was scared and nervous and felt he had no choice in the matter. After talking to Blair for 4 to 5 minutes, Cox finally told him the officers were going to have to enter the residence to find out whether the odor was coming from a home refrigerant repair shop or a methamphetamine lab. Blair suggested he would go into the house and open the garage door for the officers, but Cox said he was going into the house with Blair due to officer safety issues. Cox was concerned Blair could go inside the house and grab a gun or set the lab on fire. Blair finally let the officers in the house.

Cox entered the house through the front door and followed Blair to the interior garage door, which was locked. While walking through the house, Cox saw a large siphon on top of a TV by the front door, a police scanner, glass jars, and plastic containers in the kitchen. Based on his experience and training, Cox knew these items were used in the process of making methamphetamine.

Blair took the key, opened the interior garage door, and started backing up. Cox grabbed him and they entered the garage together. Cox saw two Mason jars with powder at the bottom and liquid in the middle, a barbecue LP gas bottle upside down on a rack with other containers, coffee filters, and funnels. Cox still smelled the strong odor of ether in the garage, and he opened the garage door that was secured with a bicycle lock through the door and the railing to let the fumes out. Cox then arrested Blair and contacted the drug task force to secure the residence and obtain a search warrant.

The trial court found Blair had no reasonable expectation of privacy in the garage when he propped the door open along a fairly busy trafficway and polluted the neighborhood with a toxic odor; the smell from the garage could have given rise to probable cause for a search warrant and did provide probable cause for the exigent circumstances; Blair gave consent to the search, although grudgingly; and Blair never unequivocally stated he wanted to talk to an attorney. The trial court stated the police officers could have handled the situation better or differently; however, it found no Fourth Amendment violation under the totality of the circumstances and denied the motion to suppress evidence.

A bench trial was held on stipulated facts regarding the results of the search of Blair's residence. The trial court found Blair guilty of possession of ephedrine.

### Suppression of the evidence

Blair argues the initial warrantless search was illegal and, therefore, the evidence obtained from the subsequent execution of a search warrant should have been suppressed.

Under the Fourth Amendment to the United States Constitution, searches conducted without warrants are per se unreasonable,

subject only to a few specifically established and well-delineated exceptions. *State v. Platten*, 225 Kan. 764, 769, 594 P.2d 201 (1979).

The State argues there was no expectancy of privacy in the garage, there was probable cause to conduct a warrantless search, there were emergency and exigent circumstances to justify an immediate search, Blair did not invoke his right to counsel, and he gave a valid consent to search his home.

The State has the burden of proof to show that a search and seizure was lawful. *State v. Box*, 28 Kan. App. 2d 401, 404, 17 P.3d 386 (2000).

" 'When analyzing a district court's suppression of evidence, an appellate court reviews the factual underpinnings of a district court's decision by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review.' " *State v. Pritchett*, 270 Kan. 125, 128, 11 P.3d 1125 (2000) (quoting *State v. Toothman*, 267 Kan. 412, Syl. ¶ 1, 985 P.2d 701 [1999]).

## Reasonable expectation of privacy

"The Fourth Amendment to the United States Constitution and Section 15 of the Kansas Constitution Bill of Rights have been found to give special deference to the sanctity of privacy in an individual's home. *State v. Platten*, 225 Kan. 765, 769, 594 P.2d 201 (1979). The viewing by police into an area where an individual has a subjective expectation of privacy that society accepts as reasonable constitutes a search. *State v. Huber*, 10 Kan. App. 2d 560, 566, 704 P.2d 1004 (1985)." *State v. Morris*, 27 Kan. App. 2d 155, 157-58, 999 P.2d 283, *rev. denied* 269 Kan. 938 (2000).

Blair claims that he had a reasonable expectation of privacy in his property when he propped open his garage door to let noxious fumes out. The officers never looked through the opening into the garage. The officers went through the front door to the garage and found items in plain view. In *Morris*, the officer peered through the hole in the blind of the window and found paraphernalia used in the manufacture of drugs. The court held the officer's action, absent a warrant, constituted an illegal search because by having the blind closed, Morris had demonstrated a subjective expectation

of privacy in his home, and such an expectation of privacy was accepted by society as reasonable. 27 Kan. App. 2d at 158.

### Search based on probable cause

Blair argues the trial court erred in finding probable cause to search the residence based on the odor of ether coming from the garage. Both the State and Blair cite *State v. MacDonald*, 253 Kan. 320, 856 P.2d 116 (1993), which Blair attempts to distinguish and the State finds controlling.

*MacDonald* was a traffic checklane search and seizure case where the officer recognized a marijuana odor coming from the car. The Supreme Court held the officer had probable cause to search the car because the marijuana odor provided the basis for the suspicion that a crime had been committed and that evidence in connection with the crime was located within the automobile. 253 Kan. at 325. The *MacDonald* court stated the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained, citing *California v. Acevedo*, 500 U.S. 565, 580, 114 L. Ed. 2d 619, 111 S. Ct. 1982 (1991). 253 Kan. at 325.

This court dealt with the issue of whether the mere odor of marijuana was sufficient to establish probable cause to search a person in *State v. Thomas*, 28 Kan. App. 2d 70, 12 P.3d 420 (2000). The court recognized that the search of an automobile was far less intrusive than a strip search of an individual, comparing the case to *MacDonald*, and held the odor of marijuana on an individual in custody, coupled with the detention facility's recognized security interests, was sufficient to establish probable cause to strip search the person in question. 28 Kan. App. 2d at 74.

The question here is whether this principle should apply to the search of an attached garage under the circumstances here. The officers in this case could have attempted to obtain a search warrant to search the residence and the garage before entering either one, instead of them entering the residence without a warrant. However, the officers did not have any other supporting evidence to show that Blair was committing the crime of manufacturing methamphetamine in his garage except for the smell of ether coming

out of it, and we find that this fact alone did not give rise to probable cause. See *State v. Bowles*, 28 Kan. App. 2d 488, 18 P.3d 250 (2001). Although ether is used in the manufacture of methamphetamine, it is not illegal to possess it. A home does not have the same mobility as a vehicle to pose a public safety threat to other drivers on the street or to aid in an escape from the police, and Blair was not in a detention facility with some limitations on his liberty rights but in his own home. We find that the officers lacked probable cause to enter the home and garage under the facts of this case.

### *Warrant unnecessary for search*

The State alternatively claims that the officers were permitted to enter the house and garage (1) because of an emergency and/or (2) Blair gave consent.

### *Emergency search*

The emergency doctrine reflects a recognition that the police perform a community caretaking function which goes beyond fighting crime. Under this function, the community looks to the police to render aid and assistance to protect lives and property on an emergency basis regardless of whether a crime is involved. Warrantless entries into and searches of private property pursuant to this exception are not prohibited by the Fourth Amendment to the United States Constitution or by § 15 of the Kansas Constitution Bill of Rights. *State v. Jones*, 24 Kan. App. 2d 405, 409-10, 947 P.2d 1030 (1997).

A three-prong test for analyzing the applicability of the emergency doctrine exception has been adopted by the Kansas courts:

" '(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

'(2) The search must not be primarily motivated by intent to arrest and seize evidence.

'(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.' " *Jones*, 24 Kan. App. 2d at 413 (quoting *People v. Mitchell*, 39 N.Y.2d 173, 177-78, 383 N.Y.S.2d 246, 347 N.E.2d 607 [1976]).

Cox's own testimony shows he was more interested in Blair's possible connection with illegal activities relating to drug use or the manufacturing of methamphetamine than rendering assistance for the protection of life or property. Cox stated he wanted to enter the garage to find out what was going on for the safety of the neighbors; however, the officers never warned the neighbors or called the fire department. Cox was obviously motivated to arrest Blair and seize evidence from his garage and house because Cox would not let Blair go back inside the house to open the garage door fully. The facts show the primary motive of the police was to search for evidence of a crime in the garage. See *Jones*, 24 Kan. App. 2d at 414 (although the possibility of criminal activity might account for the feared danger in a given case, the primary motive of the police will not be to search for evidence of a crime, but rather to render assistance). The emergency doctrine does not apply under the facts of this case.

## Consent

Blair argues he did not give any valid consent to search his property. "A consent to search must be unequivocal and specific. It must be given voluntarily, intelligently, and knowingly and proved by a preponderance of the evidence. It must be clear that the search was permitted or invited by the individual whose rights are in question without duress or coercion." *State v. Dwyer*, 28 Kan. App. 2d 238, Syl. ¶ 3, 14 P.3d 1186 (2000), *rev. denied* 270 Kan. 900 (2001).

The trial court is charged with resolving factual conflicts because it is in a position to assess the demeanor and credibility of witnesses. The appellate court cannot and will not assess witness demeanor and credibility in the same manner as the trial court. 28 Kan. App. 2d at 240. In this case, Cox admitted he would not let Blair go back inside the house without being accompanied by him and told Blair the officers had to go inside to investigate the odor of ether. Blair thought he had no choice but to let Cox come inside the house from the front door. Under the circumstances of the case, Blair's consent was hardly given voluntarily, intelligently, and knowingly.

In *State v. Rice*, 264 Kan. 232, 243, 955 P.2d 1258 (1998), the Kansas Supreme Court stated: "A police request for consent to search does not itself constitute exploitation of the primary illegality, but the consent may be combined with other, more coercive, police conduct so that the resulting consent is not voluntary." Cox did not explain to Blair that he had a choice to refuse his request to come in; instead, Cox coerced Blair to let him in through the front door. The fact that Cox asked Blair questions about drug use and wanted to see his arms for needle marks, combined with the fact that Blair was not allowed to move away from his front porch, made the police conduct even more coercive.

Blair did not give his consent to Cox voluntarily, intelligently, and knowingly under these circumstances.

We therefore find that the evidence obtained by the illegal search should have been suppressed. Blair's conviction is reversed and his sentence vacated.

Reversed and vacated.