NOT DESIGNATED FOR PUBLICATION

No. 114,844

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ANDRE D. BAILEY,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; J. PATRICK WALTERS, judge. Opinion filed March 31, 2017. Affirmed in part, reversed in part, and remanded with directions.

*Kristen B. Patty*, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON and BRUNS, JJ.

*Per Curiam*:  Andre D. Bailey was convicted of first-degree felony murder, two counts of aggravated robbery, aggravated burglary, discharge of a firearm at an occupied building, possession of marijuana with the intent to sell, and failure to affix a drug tax stamp. His convictions were affirmed by our Supreme Court on appeal. *State v. Bailey*, 292 Kan. 449, 255 P.3d 19 (2011). Bailey now appeals the district court's denial of a K.S.A. 60-1507 motion in which he alleged that he received ineffective assistance of counsel at trial and on direct appeal. We find that Bailey's counsel was ineffective for failing to file a motion to suppress the evidence recovered from the home he was sharing

1

with his mother on the basis that his mother's consent to the search was involuntary. Accordingly, we reverse his convictions for possession of marijuana with intent to sell and failure to affix a drug tax stamp and remand for further proceedings on those charges. On all other allegations of error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

When he was just 17 years old, Bailey and three of his friends, DaQuan Dean, Cheryl Starr, and Sade James, were involved in the aggravated burglary and robbery of Ricky Stewart and Meagon Hicks. Prior to leaving the scene, Bailey fired a number of shots at Stewart and Hicks' closed front door. Several of the shots hit Stewart and he died later that day from the injuries.

Bailey was charged as an adult. At his trial, numerous witnesses testified for the State, including: two codefendants in the case, Starr and James; Hicks; a neighbor who lived across the street from Stewart and Hicks; Cindale Terrell who spent time with the defendants before and after the crime; and numerous police officers. The jury found Bailey guilty of first-degree murder, two counts of aggravated robbery, aggravated burglary, criminal discharge of a firearm at an occupied building, possession of marijuana with intent to distribute, and failure to affix a tax stamp. On appeal, our Supreme Court affirmed the convictions.

Next, Bailey filed a K.S.A. 60-1507 motion alleging that he received ineffective assistance from both his trial attorney and his appellate attorney. After a hearing, the district court denied his motion. He now appeals that denial.

We note that the parties, and the Supreme Court in its affirmation of Bailey's convictions, provide a thorough overview of the facts related to the underlying criminal

2

case. See *Bailey*, 292 Kan. 449. Where relevant, some of those additional facts are discussed in more detail below.

ANALYSIS

*The district court did not violate Bailey's constitutional right to due process when it adopted the State's findings of facts and conclusions of law.*

Bailey first argues that the district court erred when it adopted findings of fact and conclusions of law drafted by the State after a hearing on his K.S.A. 60-1507 motion. Significantly, Bailey does not argue that the findings or conclusions were actually deficient because they failed to address or improperly addressed the issues he raised in his motion. Instead, he contends that the district court deprived him of due process when it delegated its duty to make findings to the State. Because Bailey asks this court to determine whether the right to due process includes the right to have a district court make independent findings of fact and conclusions of law, de novo review is appropriate. See *Johnson v. Brooks Plumbing*, 281 Kan. 1212, 1213, 135 P.3d 1203 (2006).

At a fundamental level, procedural due process requires that someone facing deprivation of life, liberty, or property at the hands of the government be given notice and a meaningful opportunity to be heard by a fair tribunal in an orderly proceeding. *State v. Robinson*, 281 Kan. 538, 547-48, 132 P.3d 934 (2006); *In re Care & Treatment of Hay*, 263 Kan. 822, 831, 953 P.2d 666 (1998). Citing Section 18 of the Kansas Constitution Bill of Rights, our Supreme Court has added that the right to due process includes the right to a remedy ordered by a tribunal after a fair hearing. *Noel v. Menninger Foundation*, 175 Kan. 751, 763, 267 P.2d 934 (1954).

The first step in determining whether an individual's right to procedural due process has been violated is to determine whether the government action being

3

challenged implicates or deprives the challenger of a protected liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332-33, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); *State v. Wilkinson*, 269 Kan. 603, 608-09, 9 P.3d 1 (2000). It is only when one of these fundamental interests is impacted that procedural due process is required. *Mathews*, 424 U.S. at 333. Here, Bailey alleges that he had a constitutional right to have the district court, without the assistance of either party, make findings of fact and conclusions of law in the disposition of his motion.

Bailey's conclusion that he has a right to independently drafted findings of fact and conclusions of law under the Kansas Constitution is erroneous. While neither this court nor the Kansas Supreme Court has considered the requirements of K.S.A. 2016 Supp. 60-252(a)(1) (requiring the entry of findings of fact and conclusions of law) or Kansas Supreme Court Rule 165 (2017 Kan. S. Ct. R. 214) (similarly requiring findings of fact and conclusions of law) explicitly in terms of due process, both have considered the practice of district courts adopting the findings of fact and conclusions of law drafted by a party. See *Stone v. City of Kiowa*, 263 Kan. 502, 505, 950 P.2d 1305 (1997); *In re Estate of Lane*, 39 Kan. App. 2d 1062, 1064, 188 P.3d 23 (2008). In *Stone*, our Supreme Court concluded that "[t]here is nothing inherently wrong with a trial court's adopting a party's findings and conclusions in their entirety as long as they had been individually considered." 263 Kan. at 506. In *In re Estate of Lane*, this court noted that "it would be good practice for a district judge to acknowledge the adoption of a party's proposed findings and to explicitly assure us and the other party that the judge has independently reviewed them," but a district judge is not required "to draft his or her own findings." 39 Kan. App. 2d at 1064.

Our appellate courts' condonation of this practice indicates that Kansans do not have a constitutional right to findings and conclusions drafted by the district court. Nor do Kansans have a statutory right to independently drafted findings and conclusions, though district courts should proceed with caution when adopting findings or risk

4

violating a party's rights. See *State v. Thompkins*, 263 Kan. 602, 617-18, 952 P.2d 1332 (1998) (noting that in addition to constitutional guarantees, statutes play a role in regulating the procedures by which proceedings are conducted); K.S.A. 2016 Supp. 60-252(a)(1). A violation may occur when the district court blindly adopts the findings and conclusions of a party. *Stone*, 263 Kan. at 506.

Here, there is evidence that the district court fully considered the State's findings of fact and conclusions of law before adopting them; as a result, there is no concern that Bailey's rights were violated. The district court explicitly stated in its journal entry denying Bailey's K.S.A. 60-1507 motion that it was adopting the State's findings after "hearing testimony, reviewing exhibits and proposed findings of fact and conclusions of law and oral arguments." This is exactly the type of explicit assurance this court has asked for under these circumstances. See *In re Estate of Lane*, 39 Kan. App. 2d at 1064.

Additionally, the district court had a second opportunity to consider its findings and correct any issues that existed. Bailey filed a motion to alter or amend the judgment asking that the district court do more than put a cover sheet on the State's findings. After a hearing on the matter, the district court denied the motion. Prior to denying the motion, the district court recognized that the Supreme Court has disapproved of district court's blindly adopting one party's findings; the court nevertheless denied the motion, presumably thereby affirming that it had sufficiently reviewed and considered the findings before adopting them.

Because Bailey did not have a protected interest in independently drafted findings and conclusions, the district court did not violate Bailey's constitutional right to due process when it adopted the State's findings. Additionally, because the district court explicitly assured Bailey that it fully considered the findings before adopting them, his statutory right under K.S.A. 2016 Supp. 60-252 was fully protected.

*Neither Bailey's trial counsel nor his appellate counsel provided ineffective assistance as to the following allegations of error.*

Bailey makes numerous claims that he received ineffective assistance of counsel both at trial and on direct appeal. Claims alleging ineffective assistance of counsel present mixed questions of fact and law. Consequently, this court reviews the underlying factual findings for support by substantial competent evidence and the legal conclusions de novo. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish that (1) the performance of defense counsel was deficient under the totality of the circumstances, and (2) the defendant was prejudiced by counsel's error. *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Miller v. State*, 298 Kan. 921, 934, 318 P.3d 155 (2014). With those standards in mind, we will examine Bailey's claims.

*Allegations Related to Trial Counsel Resolved on Direct Appeal*

Bailey rests several of his claims of ineffective assistance of counsel on alleged errors that were considered and rejected on direct appeal. First, Bailey argues that his trial attorney, Terry Beall, was ineffective because he "failed to request a specific jury instruction on his theory . . . that the underlying felonies had been completed at the time

6

the homicide was committed." On direct appeal, Bailey complained that "the felony-murder instruction [that was given] did not properly instruct the jury on the issue of whether the underlying felonies had been completed before the commission of the murder." *Bailey*, 292 Kan. at 455.

Our Supreme Court rejected the argument, determining that the felony-murder instruction that was given in the case required the jury to "find that the murder occurred while the underlying felonies were being committed or attempted." 292 Kan. at 456. Thus, the "jury's verdict finding Bailey guilty of felony murder indicate[d] that the jury found Bailey killed the victim during [the commission of] one of the underlying felonies." 292 Kan. at 456. Since the instruction that was given required the jury to consider whether the underlying felonies had been completed at the time Bailey shot Stewart, an additional instruction on Bailey's theory of defense was unnecessary.

The instructions given allowed Bailey to make the argument that he should not be convicted of felony murder because the underlying felonies were complete at the time the murder was committed; and, in fact, Beall made that argument to the jury during closing arguments. Beall did not err when he failed to request an additional instruction requiring the jury to find that the underlying felonies were complete or when he failed to object when the instructions were given.

Next, Bailey argues that Beall erred when he failed to object to the State calling Dean to testify. On direct appeal, Bailey argued that "it was error to allow the State to put Dean on the stand knowing that he would refuse to testify." 292 Kan. at 462. Although the Supreme Court noted that Bailey did not object when Dean was put on the stand so that issue was not preserved for appeal, it considered the issue anyway. 292 Kan. at 461-63.

Our Supreme Court first rejected the argument that this case was similar to cases in which a witness with a valid privilege under the Fifth Amendment to the United States Constitution refused to testify. 292 Kan. at 463. Unlike those witnesses, Dean had already entered a guilty plea and been sentenced; therefore, he had no Fifth Amendment privilege. The court then considered whether Bailey was prejudiced by Dean taking the stand and refusing to testify. It concluded that "Dean's testimony and subsequent refusal to testify further were not prejudicial to [Bailey's theory of defense]; in fact, Dean's testimony arguably bolstered Bailey's position. In any event, any inference the jury made regarding Dean's refusal to testify was inconsequential." 292 Kan. at 463.

The doctrine of res judicata prevents this court from reconsidering the Supreme Court's determination that Bailey was not prejudiced by Dean being put on the stand and refusing to testify. See *State v. Kleypas*, 305 Kan. 224, 240-41, 382 P.3d 373 (2016) (outlining the elements of res judicata). Because Bailey was not prejudiced, even if Beall erred when he failed to object to Dean being called to testify, Bailey's claim of ineffective assistance of counsel fails.

Finally, Bailey argues that Beall erred when he "failed to object when the [district] Court impermissibly coerced Starr to testify at trial under threat of holding her in contempt and imposing a jail sentence." On direct appeal, Bailey argued that "it was improper for the trial court to inform Starr that she did not have a Fifth Amendment privilege and to encourage Starr to testify." *Bailey*, 292 Kan. at 459-60. Our Supreme Court agreed with the district court that since Starr had entered a guilty plea to the charges against her—second-degree murder, two counts of aggravated robbery, and one count of aggravated burglary—she "had no Fifth Amendment privilege with regard to testimony related to those charges." 292 Kan. at 461. Although the court recognized that Bailey took issue with the way in which the district court encouraged Starr to testify, it did not explicitly address that part of Bailey's challenge. Presumably, this was because it

8

did not believe there was an error in encouraging her to testify because she had no right to refuse to do so.

Indeed, the district court did not impermissibly threaten or coerce Starr. In a hearing outside the presence of the jury, the district court explained to Starr that she no longer had a Fifth Amendment privilege because of her guilty plea. The court told Starr that the State had called her as a witness and the court could order her to testify; if she refused to testify, it could find her in contempt and order her to jail for up to 12 months. It does not appear from the transcript that the district court was rude or threating; in fact, the court noted that "I don't want to punish you for something, but the fact remains that you are here, you are required to testify. And the only remedy I have to enforce the State's subpoena is to find you in contempt if you refuse to testify." The district court finished the discussion by asking: "Are we going to have problems with you in the courtroom? I just want to know so we can all be aware of it ahead of time and respond appropriately."

Contempt, by its nature, "is a coercive remedy, the sole purpose of which is to compel a party into providing information pursuant to court order." *State v. Davenport*, 22 Kan. App. 2d 683, 685, 920 P.2d 475 (1996). That does not mean that a district court acts improperly when it presents the witness with the option of testifying or being held in contempt. See *State v. Delacruz*, 52 Kan. App. 2d 153, 171, 364 P.3d 557 (2015) (affirming the district court's contempt sanction where witness refused to testify), *rev. granted* 305 Kan. ___ (October 21, 2016). Because it was not error for the district court to attempt to compel Starr to testify by presenting her with the option of testifying or being held in contempt, Beall was not ineffective for failing to object to the district court's action.

9

*Allegations Related to Trial Counsel Raised for the First Time*

*James' Statements to Chisholm*

Bailey argues that the district court erred when it concluded that Beall was not ineffective for failing to file a motion to suppress James' statements to Detective Robert Chisholm on the theory that they were involuntary. Our Supreme Court has held that "[a] criminal defendant is deprived of due process when his or her conviction is based, in whole or in part, upon the coerced statement of a witness." *State v. Daniels*, 278 Kan. 53, 65, 91 P.3d 1147 (2004). "To determine whether a witness' statements are voluntary, the court looks at the totality of the circumstances and considers the same factors used to weigh the voluntariness of a defendant's confession." 278 Kan. at 65-66. Those factors include: "the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation." *State v. Lane*, 262 Kan. 373, 385, 940 P.2d 422 (1997); see K.S.A. 2016 Supp. 60-460(f). Additional factors that should be considered are the accused's mental condition and his or her fluency with the English language. *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). The goal of examining these factors is to determine whether a statement "was the product of the free and independent will" of the person being interrogated. *Lane*, 262 Kan. at 385.

James, through her mother, Wendy James, initiated contact with Chisholm. Chisholm, after Wendy told him that James was anxious to speak to him, called the hospital at which James had been admitted after attempting suicide and asked a nurse if he could speak with her. James agreed to speak to him. Once she was on the phone, James spoke with Chisholm for 20 or 30 minutes, recounting the events of August 11.

10

The next day, Chisholm went to the hospital to talk with James again. The conversation took place in an office at the hospital. Chisholm began the interview by asking James a series of questions to verify that she wanted to talk to him and was not impaired by or under the influence of drugs or alcohol. Chisholm then had her read out loud and initial a *Miranda* rights waiver form and asked her to verbally verify that she understood each right. See *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Chisholm spent extra time making sure that James understood that even if she began talking to him without a lawyer, she could stop at any time and wait until a lawyer was present to continue, or she could stop talking altogether. James and Chisholm then began discussing the events of August 11. The interview lasted less than 2 hours.

James was a 19-year-old high school graduate at the time of the interview. She gave coherent answers that were responsive to Chisholm's questions throughout. James was not in custody during the interview. While she did not ask to stop the interview for a break or attempt to leave the office in which the interview was conducted at any time, there is nothing to indicate that she would have been prevented from doing so. Although James was depressed at the time of the interview, she was not suffering from any mental condition that impaired her ability to understand Chisholm's questions, voluntarily answer them, or remember and relate the events of August 11. See *State v. Fernandez-Torres*, 50 Kan. App. 2d 1069, 1078, 337 P.3d 691 (2014) ("The factor bearing on a defendant's mental condition primarily looks at something that would impair the individual's ability to understand and respond to a law enforcement officer's questions."). Chisholm was friendly with James; at no point did he coerce, threaten, or even encourage James to keep talking. In short, there was nothing to indicate that James' statements were involuntary, as Bailey now alleges.

Additionally, Bailey's conclusion that Chisholm's failure to *Mirandize* James during their telephone conversation rendered the information he gained from her

11

inadmissible is incorrect. The *Miranda* warning need only be given prior to a custodial interrogation. See *State v. Goering*, 8 Kan. App. 2d 338, 338, 656 P.2d 790 (1983). Custodial interrogation "is defined as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way.'" *State v. Vanek*, 39 Kan. App. 2d 529, 533, 180 P.3d 1087 (2008). The test for determining whether a person is in custody so that a *Miranda* warning is necessary is "'based on what a reasonable person would believe under the totality of the circumstances.'" 39 Kan. App. 2d at 534. Key to determining how a reasonable person would perceive an interrogation are:

> "(1) when and where the interrogation occurred; (2) how long it lasted; (3) how many police officers were present; (4) what the officers said and did; (5) the presence of actual physical restraint . . . ; (6) whether the [individual] was being questioned as a suspect or as a witness; (7) how the [individual] got to the place of questioning, that is, whether he or she came completely on his or her own in response to a police request or was escorted by police officers; and (8) what happened after the interrogation—whether the [individual] left freely, was detained, or was arrested." 39 Kan. App. 2d at 536.

None of the *Vanek* factors indicate that a reasonable person in James' position would have perceived either conversation with Chisholm as a custodial interrogation. As a result, it was unnecessary for him to provide her with a *Miranda* warning either on the phone or when they talked in person. Nevertheless, Chisholm took the extra precaution of providing the *Miranda* warnings to James when they spoke in-person at the hospital. Chisholm's failure to read the *Miranda* warnings to James on the phone did not render that conversation inadmissible or taint the evidence gained from the in-person interview.

Because James' statements to Chisholm were voluntary and did not violate her *Miranda* rights, Beall did not provide ineffective assistance when he failed to file a motion to suppress the statements. Since Beall's performance was not deficient, it is unnecessary to go on to the second step of the ineffective assistance of counsel test.

12

*Statements Starr Made to Mumma*

Bailey next argues that Beall was ineffective for failing to file a motion to suppress statements Starr made to Detective Blake Mumma. Bailey contends that Starr's statements were involuntary because Mumma threatened to use her lack of cooperation against her and improperly fed her facts about the crime that she merely repeated during her confession. The district court found that Starr's statements were voluntary; as a result, Bailey failed to establish that Beall was ineffective. Again, a criminal defendant is deprived of due process when his or her conviction is based, in whole or in part, upon the coerced statement of a witness." *Daniels*, 278 Kan. at 65. To determine whether statements were voluntary, this court looks at the totality of the circumstances. 278 Kan. at 65-66.

At the time Mumma interviewed Starr she was an 18-year-old high school graduate planning on attending college at Wichita State University. She did not have any mental or physical health issues that would have interfered with her ability to talk to Mumma and she was not under the influence of any drugs or alcohol at the time of the interview. Mumma completed gathering biographical information on Starr at 1:10 pm, he then informed her of her *Miranda* rights, and verified that she understood each. Starr then agreed to talk with the detective. The interview lasted less than 1 1/2 hours.

Mumma began the interview by letting Starr know that the police had spoken with James and that she had identified Starr as someone who was involved in the robbery and homicide. Mumma then told her: "[W]hat we would like to do is uh you're up her [*sic*] obviously is my understanding or belief that you would like to cooperate with us on that and that's that would certainly be extensively to not just to our benefit but I believe to your benefit as well." Mumma made similar statements at other points during the interview when he did not believe Starr was telling him the truth.

13

The most significant episode came about half-way through the interview. At that time, Mumma let Starr know that her story was not matching up with the information they had received from James and the evidence they had recovered from Bailey's home. Mumma tried to coax Starr into cooperating by appealing to her friendship with James, reminding her that they have ways—such as fingerprinting, DNA testing, and photo lineups—to verify the truth of her story, and reminding her that cooperating was in her best interest. Mumma's comments included:

"This is a homicide case now you know you and I got to talk about that we got to talk about what they said you know what they told you in the car before they got over there how they got ready for that what they say when they came back we got to talk about all those things or you're not helping yourself.

. . . .

"Now I don't know if you're ready to talk to me about that or not ok but you don't realize it but this here is the lottery this here is your chance this is the stop we're stopping right here for you right now ok. Honest to god honest to god this is it and your using your chance up poorly in my opinion you, your opportunity to tell us exactly how this thing happened ok cause down the road after, after Kuan [*sic*] after Andre and especially after Sade said all this well they won't be offering this opportunity in the future they will already know all this stuff ok. Your opportunity is now and you're spending it poorly in my opinion . . . . [Y]ou are going to assist me and I promise you, you know you assist me now I'm going to have something good to say about ya I'm not going to walk out of here and say damn it we got problems with that girl you assist me and I walk out of here and I tell those people that make those decisions hey this is somebody that we can count on this is somebody that's going to help us out that's the place you want to be."

Immediately after Mumma's speech, Starr began providing details related to the robbery and homicide. Nevertheless, at several additional points during the conversation Mumma felt the need to stop Starr and again remind her that she needed to be truthful with him because if she was not, he would find out from other sources. During one of those instances, Mumma pushed Starr on her story. He appeared skeptical of her

14

insistence that she had not been to the house where the crime occurred prior to August 11.

Mumma first asked Starr if she had been to the house before the 11th; after she said no, he told her that a witness said that a girl with hair just like hers had been to the house before with two guys. Starr denied ever having been to the house. Mumma repeated that a witness had seen a girl like her there before, that the witness had described a girl "with your hair to the T." Starr again denied having been to the house previously. Mumma then told Starr that there were ways for them to verify whether she was telling the truth; for instance, he could put her picture in a photo lineup for the witness to identify "[a]nd I see if they pick you out you know and at this point I mean it really doesn't matter whether you were there before or not it just . . . adds to the level of honesty." He then reminded her:

> "I can say look she has been very honest with me she's been up front and she's been cooperative and she's been a person that you might want to give some consideration to. But if you've been there before and your [*sic*] excluding that.
>      . . . .
>      "It makes it hard for me to do that."

In the face of Mumma's pressure, Starr continued to deny having ever been to the home, saying:

> "Yea but listen though listen to me what I'm saying all this shit on a homicide would I lie about I've been there before I was there that night you know what I'm saying and I was over in that area that night why would I why would I sit here and tell you that I've never been in that house."

15

Despite Mumma's pressure, Starr maintained her position and pushed back against him. The episode sheds light on the issue of whether Starr's will was overcome by Mumma's tactics so that her statements were involuntary.

When courts consider the voluntariness of a confession, their primary concern is with determining whether the tactics an officer used to elicit the confession had the effect of overcoming the independent will of the person confessing. See *Fernandez-Torres*, 50 Kan. App. 2d at 1083. The same factors considered in connection to James' statement are considered here:  the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; the fairness of the officers in conducting the interrogation; the suspect's mental condition; and, the suspect's fluency with the English language. *Stone*, 291 Kan. at 21; *Lane*, 262 Kan. at 385.

In this particular instance, the concern is with the tactics used by Mumma to elicit Starr's confession, *i.e.*, the fairness of the officer in conducting the interview. Factors that may raise red flags when considering whether police acted appropriately are if the police: threatened a suspect or promised some benefit in exchange for cooperation, minimized the seriousness of confessing to involvement a crime, falsely told the suspect that there was evidence indicating his or her involvement in the crime, or used of other deceptive techniques. See *State v. Swanigan*, 279 Kan. 18, 32-36, 106 P.3d 39 (2005); *Fernandez-Torres*, 50 Kan. App. 2d at 1081-82.

Assuming, for the sake of argument, that Mumma crossed the line and used tactics that were unfair, that is only one factor in the overall determination of whether Starr's confession was involuntary. Other factors would weigh against finding that the confession was involuntary. Starr was a native English speaker with a high school diploma who was planning on attending college. She was able to follow and appropriately answer the questions that were being asked of her and her mental state was

16

not impaired by any temporary conditions such as alcohol or drug use. The interview lasted less than 2 hours and it was initiated after Starr voluntarily went to the police station to talk to officers. Starr did not request a break or communication with the outside world during the interview, but there is no reason to believe she would have been denied such amenities had she asked for them. Importantly, Starr did not capitulate to Mumma's pressure. While she did begin sharing details of the crime after his long speech half-way through the interrogation, Mumma's tactics did not work later in the interview when he attempted to get Starr to admit that she had been to the house on Volutsia prior to the night of the crime.

Considering all the factors, Starr's will was not so overcome by Mumma's tactics that her statement to him was involuntary. Because Starr's statement was voluntary, it was not error for Beall to fail to seek its suppression.

We pause to note that Bailey argues that *Starling v. State*, 130 A.3d 316 (Del. 2015), stands for the proposition that this court need not be concerned with whether Starr's statement was voluntary, just with the fact that Beall could have objected and made the State prove voluntariness. That is not an accurate reading of the case. In fact, the Delaware Supreme Court considered whether the statement at issue was voluntary, determined that there was "substantial evidence pointing to the involuntariness of [the] statement," and ultimately concluded that counsel was ineffective for failing to object to the statement's admission. 130 A.3d at 330. While the case may stand for the proposition that an appellate court considering a similar issue need not make a concrete factual finding regarding voluntariness, it does not stand for the proposition that an appellate court should not consider the issue at all—some consideration is necessary to determine whether an objection should have been made by trial counsel. Nevertheless, even if it was error for Beall not to object, Bailey cannot prove prejudice. There was significant evidence linking Bailey to the robbery and murder even without Starr's testimony—most importantly the testimonies of James and Terrell. With all the additional evidence that

17

was available to the jury, there is not a reasonable probability that it would have reached a different result even if Beall had successfully objected and Starr's testimony had been excluded.

*Prosecutorial Misconduct—Vouching for Credibility of a Witness*

Bailey alleges that the prosecution improperly vouched for the credibility of two of its witnesses, Mumma and James, by asking each of them questions meant to highlight the truthfulness of their testimony. A prosecutor commits misconduct (now described as prosecutorial error) when he or she "attempt[s] to obtain a conviction in a manner that . . . offend[s] the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Bailey cites no cases with similar fact patterns in which a court has found prosecutorial misconduct. The closest he comes is a Michigan case, *People v. Enos*, 168 Mich. App. 490, 425 N.W.2d 104 (1988).

There, the prosecutor asked two different witnesses a series of questions about their duty to testify truthfully and the impact dishonesty would have on their plea bargains, *i.e.*, if they did not testify truthfully the deals would be voided and they could be recharged. The questions in that case were numerous and went directly to the truthfulness of the witnesses' testimony. For instance:  "'[W]ere you allowed to plead to one count of attempted uttering and publishing, a felony charge, if you testified truthfully regarding William Enos?'" and "'You understand that if you do not testify truthfully that the deal fails, and you could be recharged?'" 168 Mich. App. at 492-93. During closing argument, "the prosecutor reemphasized that [the witness] had promised to testify truthfully, had been informed on the stand that the deal might not be honored since he had lied, and then had stated that the rest of his story was untrue." 168 Mich. App. at 495. The appellate court found that, under the circumstances, the prosecutor's questions and statements impermissibly suggested "'that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully.'" 168 Mich. App. at 495.

18

Here, the questions the prosecutor asked Mumma and James were isolated and were nothing like the questions asked in *Enos*. The question the prosecutor asked Mumma was in response to the defense challenging his interrogation method. The prosecutor asked:

"Q.     And in this particular interview, did you present—
                "You've already testified on cross-examination that there were many
        times that you presented information to Ms. Starr during this interview.
                "Is that correct?
"A.     As the defense has said, approximately five different times.
"Q.     Okay.
                "And as you presented information to her, um, would she expand further
        on the information you gave her?
"A.     Each and every time. Each and every time that we presented her with new
        information, she did take that and expand and elaborate on the facts that we had."

The prosecutor did not ask about the veracity of Starr's statements to Mumma, she merely highlighted the fact that any attempts by the defense to paint Starr's confession as a simple parroting back of information the police had fed her was inaccurate. This was not error and would not have provided a foundation for an objection by Beall.

The question Bailey objects to the prosecutor asking James was about the terms of her plea agreement. The prosecutor went over the terms of James' plea agreement, asking her about the charges she agreed to plead to and the sentences the State agreed to recommend. Towards the end of the exchange, the prosecutor asked:  "[James], what do you have to do in order to get that recommendation?" James replied:  "Tell the truth." The prosecutor immediately moved on from there to questions about James' statement to police in the days after the crimes.

19

In *State v. Edwards*, 39 Kan. App. 2d 300, 310-11, 179 P.3d 472 (2008), the prosecutor directly asked about truthful testimony being a condition of the testifying witness' plea agreement. The prosecutor asked: "'[A]s part of that plea, have you agreed to testify truthfully today?'" and "'[S]o, the deal isn't contingent upon you saying a certain thing, it's upon you being truthful, correct?'" 39 Kan. App. 2d at 310. Despite these overt questions regarding the witness' truthfulness, this court found that the prosecutor had not committed misconduct because the "questions [were] designed to establish the terms of the plea bargain" which was necessary so that the jury could assess the credibility of the witness' testimony. 39 Kan. App. 2d at 311.

Because the prosecutor's question to James was about the terms of her plea agreement, asking it was not error. As a result, the district court was correct to find that Beall did not provide ineffective assistance to Bailey when he failed to object to this question.

*Prosecutorial Misconduct during Closing Arguments*

Bailey next argues that there were two times during closing arguments that the prosecutor committed misconduct and Beall failed to object. The first alleged error occurred when the prosecutor told the jury that Bailey was likely to argue that the underlying felonies were complete at the time the murder took place so that the facts did not support a conviction for felony murder. The prosecutor went on to explain that whether the crimes were complete is a question for the jury. Bailey contends that this was a deliberate misstatement of the law because our Supreme Court has held that the crime of aggravated burglary is complete when a defendant enters a building in which there is an individual present and the crime of aggravated robbery is complete when a defendant takes possession of the item(s) that did not belong to him or her.

20

As discussed above, on direct appeal our Supreme Court considered whether it was error for the district court to give the instruction that mirrored the prosecutor's discussion of the findings the jury needed to make to sustain a guilty verdict on the felony-murder charge. The Supreme Court found that it was not. However, even if the prosecutor's discussion can be distinguished from the instruction and the prosecutor erred in her overview of the law as it related to the completion of the underlying felonies of aggravated burglary and aggravated robbery, the error was harmless. See *Sherman*, 305 Kan. 88, Syl. ¶¶ 7, 8 (prosecutorial error is only reversible error if the State is unable to prove that the error did not affect the outcome of the trial in light of the entire record). In his brief, Bailey fails to acknowledge the third crime that could have provided the basis for the jury's determination that he was guilty of felony murder:  criminal discharge of a firearm. Stewart was killed as a result of someone firing on his house from outside the front door. There was sufficient evidence to sustain the jury verdict that Bailey was the person who fired the shots at the house and was therefore guilty of criminal discharge of a firearm. That crime was obviously ongoing at the time Stewart was struck with the bullets that ultimately killed him.

Criminal discharge of a firearm provided a basis from which the jury could, and probably would, have found Bailey guilty of felony murder even if Beall had successfully objected to the prosecutor's discussion of aggravated burglary and aggravated robbery as ongoing crimes sufficient for sustaining a guilty verdict. So even if Beall's performance was deficient, Bailey was not prejudiced by the error.

Bailey also briefly argues that Beall erred when he failed to object to the prosecutor vouching for witnesses during closing arguments. Again, even if the prosecutor improperly vouched for Starr and James so that Beall provided deficient representation when he failed to object, Bailey was not prejudiced by the error. Had Beall objected to the prosecutor's vouching for the witnesses and the district court instructed

21

the jury to disregard the prosecutor's statements, the outcome of the trial would have been the same because the evidence of Bailey's guilt on all charges was overwhelming.

*Appellate Counsel's Failure to Raise the Issue of Prosecutorial Misconduct during Closing Arguments*

Bailey next argues that his appellate counsel, Michael Whalen, was ineffective for failing to raise the issue of prosecutorial misconduct during closing arguments on Bailey's direct appeal. To establish ineffective assistance of counsel on appeal, a defendant must show that: (1) counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness, and (2) the defendant was prejudiced to the extent that there is a reasonable probability that, but for the deficient performance, the appeal would have been successful. *Miller v. State*, 298 Kan. 921, 930-31, 318 P.3d 155 (2014). As with the analysis of trial counsel, analysis of appellate counsel's performance begins with a strong presumption that counsel's conduct was reasonable. 298 Kan. at 931. "[F]ailure to raise an issue on direct appeal is not per se ineffective assistance." 298 Kan. at 932.

In the journal entry on this claim, the district court noted that at the K.S.A. 60-1507 hearing, Whalen testified that "he now believed the prosecutor was vouching for witness credibility, yet did not raise the issue" on appeal. Nevertheless, the district court concluded that Bailey was not prejudiced by Whalen's failure to raise the issue.

Had Whalen raised the issue, the district court would have examined the instance of alleged vouching to determine if it was error and, if so, whether the error prejudiced Bailey. See *Sherman*, 305 Kan. 88, Syl. ¶¶ 7, 8. As previously discussed, the evidence against Bailey was overwhelming so that the outcome of the trial would have been the same even if Beall had objected to the prosecutor's statements during closing arguments.

22

Finding no prejudice, our Supreme Court, on direct appeal, would have upheld Bailey's convictions even if Whalen had raised the issue of prosecutorial error.

Because Bailey was not prejudiced by Whalen's deficient performance, his ineffective assistance of appellate counsel claim fails.

> *Failure to Object to the Lack of a Reckless Second-Degree Murder Instruction and Failing to Insist on Bailey's Presence During Discussion of a Jury Question*

Bailey makes several allegations that his counsel erred but also recognizes that Kansas law prohibits his success on those claims. Because Bailey raises these issues merely to preserve them for federal review, detailed discussion of them here is unnecessary. It is sufficient to note, as Bailey does, that *State v. Todd*, 299 Kan. 263, 279, 323 P.3d 829 (2014), firmly resolves the issue of whether it was error for Beall not to object to the district court's failure to give a reckless second-degree murder instruction. Additionally, *State v. Sanders*, 227 Kan. 892, 893-94, 610 P.2d 633 (1980), resolves the issue of whether Bailey was prejudiced when he was not present at the time a jury question regarding whether the jury could consider second-degree murder was discussed by the district court and counsel.

Because these issues have been firmly resolved against Bailey, the district court did not err when it concluded that neither trial nor appellate counsel was ineffective for failing to raise them.

*Bailey's trial counsel was ineffective for failing to object to the search of Bailey's home and the resultant admission of the evidence related to the possession of marijuana and tax stamp charges.*

Bailey next argues that Beall was ineffective because he failed to file a motion to suppress evidence obtained during a search of Bailey's home. The district court found that Bailey failed to meet his burden to establish that had Beall filed a motion to suppress, the district court, after a hearing, would have found that his mother's consent to the search was involuntary and suppressed the evidence. On appeal of that decision, Bailey argues that there was "a strong basis to file a motion to suppress." He contends that Beall's failure to file such a motion prejudiced him because without the evidence gathered from the search the jury would not have been able to convict him of possession of marijuana or failure to affix a drug tax stamp.

For a consent to search to be valid, "(1) [t]here must be clear and positive testimony that consent was unequivocal, specific, and freely given; and (2) the consent must have been given without duress or coercion, express or implied." *State v. Spagnola*, 295 Kan. 1098, 1107, 289 P.3d 68 (2012). Whether consent was freely given is determined by looking at the totality of the circumstances. 295 Kan. at 1107. The test is "whether a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter." 295 Kan. at 1107.

In its journal entry, the district court made note of the following relevant facts:

- At the time Bailey's mother, Terrie Walker, returned to her home and was asked to sign a consent to search, the house was surrounded by at least 15 to 20 police officers, some of whom had guns drawn.
- Officers were insistent that Walker needed to sign the waiver form and did not inform her of her right to refuse and demand officers obtain a warrant.

- Walker did not believe she was free to refuse to sign the form.
- Officers "did not physically intimidate [Walker] through words or actions."
- While Walker testified that it was dark outside so she was unable to read the form that she signed, the district court found her testimony on that point unbelievable. The court reasoned that if Walker could see the form to sign it then she could see the form to read it.

Some additional facts not highlighted in the journal entry are worth noting. First, Walker was stopped by police and asked to consent to the search after she pulled into her driveway while she was walking towards, but before she reached, her house. She was not allowed entry into the house. It was 12:40 a.m. when Walker signed the consent form. Walker was standing outside at the time she signed and used the hood of a car as a writing surface. Additionally, at the time she was being asked to sign the consent form, Walker's son, Bailey, was being removed from the house and arrested.

After considering all this evidence, the district court concluded:

"A suppression hearing would have included testimony from officers at the scene and would not have been limited to testimony from movant and his mother. Consequently, it is difficult, if not impossible, to conclude in movant's favor that the outcome of this case would have been different if a suppression hearing had been held."

As a result, the district court found that Bailey failed to meet his burden to prove ineffective assistance of counsel. Additionally, the district court noted "that the suppression of the marijuana would have had no bearing on any of the charges except for the marijuana charge and the no tax stamp charge."

The district court erred when it reached its conclusions. Bailey presented strong evidence that Walker's consent to search her house was not valid, including: the number

25

of officers surrounding her house; the presence of officers with weapons drawn; the fact that she was stopped from entering her house until she signed a consent form; the conditions under which the form was presented to her, *i.e.*, at night when she could not see to read the form and at a time when she was vulnerable due to her son being arrested; and, Walker's testimony that she did not feel free to refuse the police. See *Spagnola*, 295 Kan. at 1107-08 (presence of multiple officers may strongly suggest a coercive atmosphere and consent that is the result of intimidation is not valid); *State v. Garcia*, 250 Kan. 310, 316-19, 827 P.2d 727 (1992) (finding the fact that defendant signed a written consent form was not determinative of whether consent was knowing and voluntary when defendant was not allowed time/opportunity to review the form); *State v. Blair*, 31 Kan. App. 2d 202, 209-10, 62 P.3d 661 (2002) (consent was not voluntary where police would not let the defendant back into his house prior to obtaining defendant's consent to search). Given that there was no contradictory evidence presented at the K.S.A. 60-1507 hearing that could have led the district court to believe that Bailey's or Walker's testimony regarding the circumstances surrounding the consent was inaccurate, the conclusion that other evidence would have kept the court from granting a motion to suppress had there been a hearing on the issue lacks foundation.

The fact that evidence obtained in the search only related to two of Bailey's more minor convictions has no bearing on whether Beall was ineffective for failing to file a motion to suppress the evidence, as the district court seems to imply. While Bailey may not spend any more time in prison because he was convicted of the crimes due to the structure of his sentence, he was nevertheless convicted of those crimes. Significantly, the only evidence of either crime was obtained in the search of the house—had Beall filed and been successful in obtaining a suppression order, Bailey could not have been convicted of either crime.

While great deference should be afforded to Beall as this court analyzes his actions, we have no hesitance in concluding that he was ineffective for not filing a motion

to suppress evidence obtained in the search of Walker's home. See *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). There was strong evidence that the consent Walker gave was not voluntary. There was no strategic reason for Beall not to file a motion to suppress this evidence. Importantly, there is a reasonable probability that that the jury would have reached a different result on the charges of possession of marijuana and failure to affix a drug tax stamp had Beall's performance not been deficient.

To the State's point that the district court found that Walker's testimony was not credible—this was a limited finding. The district court found that "[t]he form was neatly and thoroughly filled out by Ms. Walker, which indicates she could adequately see the form before signing it and was not simply rushed or pressured into signing it." Walker did testify that she wrote her name, address, and the time on the form in addition to signing it, indicating that she could see the form sufficiently well that she probably could have read it. Nevertheless she also testified that she felt pressured into signing it and was not given an opportunity to thoroughly read the document, nor did officers read the document to her. This point is emphasized by Walker's testimony that she was outside, signing the waiver on the hood of a car at approximately the same time her son was being arrested.

This court must not disturb the district court's finding that Walker's testimony that she was unable to read the consent form lacked credibility. However, the district court's finding that Walker was not rushed or pressured into signing the form is not supported by substantial competent evidence. Walker testified that she felt pressured into signing, and circumstantial evidence supports a finding that a reasonable person in her position would have felt coerced into giving officers consent to search. Additionally, any broader implication that Walker was not a credible witness is not supported by the evidence presented—Bailey's and Walker's testimonies regarding the circumstances surrounding the giving of consent supported each other and were not contradicted by any other

27

witnesses. Thus, there would have been no evidence from which to find that the testimonies were not credible.

*Conclusion*

While most of Bailey's claims of ineffective assistance of counsel lack merit, Beall was ineffective for failing to file a motion to suppress the evidence gathered in the search of Walker's home because there was strong evidence that her consent to search was not voluntary. This error had a limited impact on the trial as the evidence obtained in the search primarily related to the charges of possession of marijuana and failure to affix a drug tax stamp. Without the evidence, however, it would have been impossible for the jury to convict Bailey of those two charges. Accordingly, the convictions of possession of marijuana with the intent to distribute and failure to affix a drug tax stamp are reversed based on ineffective assistance of counsel and remanded to the district court for further proceedings.

In sum, we deny Bailey's requested relief and affirm the district court on the effectiveness of his counsel related to all of his convictions other than the convictions for possession of marijuana with the intent to distribute and the failure to affix a drug stamp. We find his counsel was ineffective for failing to file a motion to suppress related to those charges. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.